**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

AARON BRADLEY JEREB,

    Defendant - Appellant.

No. 16-4127

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CR-00610-TC-1)**
_____

Scott Keith Wilson, Assistant Federal Public Defender (Kathryn N. Nester, Federal Public Defender, and Jessica Stengel, Attorney, with him on the briefs), District of Utah, Salt Lake City, Utah, for Defendant - Appellant.

Ryan D. Tenney, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the brief), District of Utah, Salt Lake City, Utah, for Plaintiff - Appellee.
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Following a jury trial, Aaron Bradley Jereb was convicted of forcibly opposing a

federal officer, in violation of 18 U.S.C. § 111(b), along with three lesser crimes. The

trial judge sentenced Mr. Jereb to prison for seventy-two months, to be followed by thirty-six months of supervised release. As a special condition of that release, Mr. Jereb will be required to participate in a mental health treatment program.

Mr. Jereb asks this court to vacate his § 111(b) conviction and remand for a new trial. In the alternative, he asks us to reverse the imposition of mental health treatment and remand for resentencing. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm both the conviction and sentence.

## I.    BACKGROUND

### A.  *Factual History*

This case arises out of a roadside brawl between Mr. Jereb and Darren Schiedel,[1] a law enforcement officer of the United States Forest Service. Officer Schiedel and his K-9 partner, a German Shepherd called Livo, were driving home on October 15, 2015, when they happened upon a red Chevrolet Blazer parked on the side of a remote, narrow road in Uinta-Wasatch-Cache National Forest ("Uinta"). Thinking that unusual given the late hour and lack of nearby recreation opportunities, Officer Schiedel decided to stop, pulling up behind the Blazer. He engaged his truck's side spotlight, exited, and approached, for the moment leaving Livo behind.

---

[1] Officer Schiedel's last name is spelled inconsistently in the record, including at times in the trial transcript. At trial he testified that it is spelled "Schiedel." In this opinion, we use the correct spelling when quoting from record materials, without noting the alteration in each instance.

Mr. Jereb was seated in the Blazer's front passenger seat. His girlfriend at the time, Amber Haanpaa, was in the driver's seat. That morning, Mr. Jereb and Ms. Haanpaa each took three to five hits of methamphetamine and then drove from their home in Rock Springs, Wyoming, to Salt Lake City, Utah, apparently for the purpose of retrieving Mr. Jereb's motorcycle from impoundment.[2] Those plans soon changed. Upon arriving in Salt Lake City, Ms. Haanpaa purchased $900 worth of heroin, some of which she and Mr. Jereb intermittently smoked in a downtown parking lot for the next 90 minutes or so.[3] Eventually, Mr. Jereb and Ms. Haanpaa got something to eat and then spent an hour or two at a music store before setting off for the three-hour trek back to Rock Springs. On the way out of town, they stopped at Uinta's Lambs Canyon to again use drugs, as was Ms. Haanpaa's custom on her return trips from Salt Lake. Ms. Haanpaa

---

[2] From the Presentence Investigation Report, we gather that Mr. Jereb's motorcycle was impounded after he was arrested in Utah about three weeks prior. On September 23, Mr. Jereb was riding a motorcycle in Wyoming when he was stopped by a Wyoming Highway Patrol officer. While the officer was checking Mr. Jereb's license information, Mr. Jereb allegedly fled the scene, leading officers on an interstate chase that reached speeds as high as 114 miles per hour. He eventually submitted to a traffic stop in Utah, where he was arrested and taken into custody. Mr. Jereb was extradited to Wyoming on October 6 and released on bond on October 7.

[3] Ms. Haanpaa testified that both she and Mr. Jereb had accelerated their drug use since September 8, when Ms. Haanpaa's ovaries were unexpectedly removed during surgery. The couple had planned on getting married and starting a family, and they "both kind of just lost it after that." App. App'x, Vol. III, at 689. In the period between September 8 and October 15, she and Mr. Jereb "started doing . . . all of the drugs that we could get our hands on basically. If meth came around, we did it." *Id.* Mr. Jereb's paranoia "skyrocketed" during this time. *Id.* at 690. For example, Ms. Haanpaa testified that Mr. Jereb would "tweak out" over bug reports on his phone, which he suspected was hacked, and he would tell Ms. Haanpaa that she was somebody else. *Id.* at 690–91.

3

pulled out a sheet of heroin and started smoking it; she believes Mr. Jereb partook. Next, she crushed some methamphetamine on a mirror and snorted it with a "tooter," or a rolled-up receipt. She handed the tooter to Mr. Jereb, who was about to snort the next line when Officer Schiedel pulled up behind them.

Ms. Haanpaa attempted to hide the drug paraphernalia, but her efforts were to no avail. About two hours later, after investigation and questioning not relevant on appeal, Officer Schiedel wrote drug possession citations for both Mr. Jereb and Ms. Haanpaa. Believing Mr. Jereb was sober enough to drive back to Wyoming, Officer Schiedel told them they were free to go. At trial, Officer Schiedel testified that he "wanted out of there at that point." App. App'x, Vol. III, at 355. Mr. Jereb's erratic behavior worried him. He was "wild eyed," with "a real direct gaze about him," and "it was getting to the point where I was starting to get a little bit concerned about his demeanor towards me." *Id.* at 317. When Officer Schiedel attempted to hand him his citation, for instance, Mr. Jereb just stared into Officer Schiedel's eyes. But the Blazer's engine would not start, so Ms. Haanpaa asked Officer Schiedel if he would be willing to use his patrol truck to jumpstart it. Not wanting to leave them stranded, Officer Schiedel agreed.

Mr. Jereb exited from the driver's seat, put on a black leather jacket, and retrieved jumper cables from the back of the Blazer. That concerned Officer Schiedel because the jumper cables "seemed like a pretty good weapon." *Id.* at 356. He was also concerned that Mr. Jereb may have put on the leather jacket for the purpose of protecting himself in the event of a fight. Nevertheless, they succeeded in jumpstarting the Blazer without

4

incident. Officer Schiedel detached the jumper cables from the battery and started to return to his patrol truck. At trial, he described what happened next:

> . . . Mr. Jereb was standing by the front right quarter panel on the passenger side. He looked [at] me, I would say close to my eyes but not really. It appeared to me that he was looking at my face or slightly above my eyes, not like making eye contact at this point.
>
> . . . .
>
> When I started to retreat back to my vehicle, he stated, you don't look so good, officer, something to that effect. And I said, I feel great. I feel fine. He moved around the vehicle to where we were both in front of the red Chevy Blazer and said, again, stated, you don't look so good. And I again replied, you know, I feel fine. Confusing words to me at that time.
>
> [Prosecutor:] What did you do after the second time the defendant told you you didn't look so good?
>
> [Officer Schiedel:] The way my radio is positioned on my body, I would have reached up with my left hand and engaged the radio and stated my name or my call sign and asked for a backup unit at that point.
>
> . . . .
>
> [Prosecutor:] When you called for backup, was Mr. Jereb within a distance where he would have heard what you said?
>
> [Officer Schiedel:] Within slightly over probably an arm's reach, probably within four feet of me.
>
> [Prosecutor:] And would you have said it loud enough so he could have heard?
>
> [Officer Schiedel:] I would have to.
>
> [Prosecutor:] When you called for backup, what happened?
>
> [Officer Schiedel:] I don't remember anything happening on the radio. Our radio, there's a beep prior to the transmission or after, and I can't recall at this time, to allow you to know that that transmission has gone out. I don't remember hearing anything on the radio at that point.
>
> [Prosecutor:] And did the defendant say something at that point?
>
> [Officer Schiedel:] Yes.
>
> [Prosecutor:] What did he say?
>
> [Officer Schiedel:] They're not going to get here in time to help you.
>
> [Prosecutor:] Officer Schiedel, how did you take that statement from the defendant?
>
> [Officer Schiedel:] Aggressive, assaultive statement.
>
> [Prosecutor:] Did you have a reaction to his statement that they wouldn't get there in time to help?
>
> [Officer Schiedel:] I did. I reached out and pushed my deployment button for canine Livo.

5

*Id.* at 358–60. Officer Schiedel testified that Livo immediately came to his side. Mr. Jereb then "made some comments to the dog, c[a]joling him, kind of trying to get him, drawing him to him, saying what a nice dog he was and tried to get him to come to him." *Id.* at 362.

At around this time Ms. Haanpaa exited the Blazer, where she had been sitting, and asked Mr. Jereb to return to the Blazer. According to Officer Schiedel, Livo responded by repositioning himself in between Officer Schiedel, Mr. Jereb, and Ms. Haanpaa, bringing him closer to Mr. Jereb than he had been previously. Mr. Jereb then "reached out very quickly and grabbed canine Livo" by his collar, twisting it and causing Livo to scream in pain. *Id.* at 368, 370–71. From there, Officer Schiedel's recollection is limited:

> [Officer Schiedel:] When I heard the scream, I don't remember anything from that point. I have a very hard time remembering. My guess is I stepped forward to defend my partner.
> . . . .
> [Prosecutor:] Was there a physical confrontation?
> [Officer Schiedel:] I believe so, yes.
> [Prosecutor:] Tell us, walk us through, Officer Schiedel, what you recall transpiring after the defendant had grabbed the collar.
> [Officer Schiedel:] I have no memory from the initial contact. I remember from the front left quarter panel where we were standing next to my vehicle, I remember—my next recollection is farther from there to the west, which would have been towards the hillside, the next recollection that I have is canine Livo had Mr. Jereb down on the ground by his right forearm. Our dogs are bite and hold. He had bitten his right arm and was holding him down. And I can remember his back, and I remember thinking, this is probably a good place to use a Taser. I think the Taser was already in my hand at that point, so I deployed the Taser at that point.

6

*Id.* at 372. Ms. Haanpaa, on the other hand, gave a somewhat different account.[4]

Ms. Haanpaa was sitting in the driver's seat when the Blazer was jumpstarted; she turned the key in the ignition. Once the car was running, she remained in the driver's seat for a minute or two, waiting for Mr. Jereb, who was still outside. It was late at night and she could not see either man from the driver's seat, so she exited the vehicle "to go see what was going on and why we were not leaving." *Id.* at 723. She then testified as follows:

> [Ms. Haanpaa:] I saw Aaron and the officer just standing looking at each other. They were talking. I couldn't hear what they were saying because the Blazer was on and it is a really loud vehicle.
> [Prosecutor:] What did you see next?
> [Ms. Haanpaa:] I saw the officer say something in his radio and he pulled out his taser and it got crazy.
> [Prosecutor:] What is Officer Schiedel saying now?
> [Ms. Haanpaa:] Telling Aaron to get down.
> [Prosecutor:] How are you able to hear him now?
> [Ms. Haanpaa:] Because I had walked over to him. I was in front of the vehicle, in front of Aaron's vehicle.
> [Prosecutor:] How many times does Officer Schiedel tell Mr. Jereb to get down?
> [Ms. Haanpaa:] Well, he took out his taser and tased Aaron. That kind of dropped him down but it didn't completely—like he was not like on his back or anything. It didn't completely like stop him. Aaron just kind of sat on his butt and that is when Schiedel came up to him and grabbed him on his shoulder and was telling him that he needs to get on his stomach and put his hands behind his back.
> . . . .
> [Prosecutor:] Can you briefly describe to the jury how Mr. Jereb is sitting on the ground now?
> [Ms. Haanpaa:] He is kind of sitting Indian style, but he has got his left leg up, so his one leg was crossed like he was sitting Indian style and the other leg was up just like he was posted up on his leg.

---

[4] Mr. Jereb did not testify.

[Prosecutor:] What is Officer Schiedel saying to him?

[Ms. Haanpaa:] He is just telling him that he needs to get his hands behind his back, but at that time the dog appeared out of nowhere. I don't know how the dog got there, but he just—Schiedel kept telling Livo—he would just nod his head to the dog and the dog would bite him.

*Id.* at 724–25. Ms. Haanpaa testified that she witnessed Mr. Jereb's interactions with Livo, and she said Mr. Jereb neither touched his collar nor tried to lure him to his side. She further testified that Mr. Jereb was Tased by Officer Schiedel before he was bitten by Livo.

Officer Schiedel acknowledged that he could not recall whether he drew his Taser before or after Mr. Jereb grabbed Livo's collar. He did recall, however, that Livo was still biting Mr. Jereb's right arm while he discharged the Taser onto Mr. Jereb's back while Mr. Jereb lay on his stomach. From there, Officer Schiedel believes he was on top of Mr. Jereb trying to handcuff him, which proved difficult with a Taser in his left hand and Livo attached to Mr. Jereb's right forearm. So Officer Schiedel commanded Livo back to the patrol truck. But Officer Schiedel still was unable to handcuff Mr. Jereb, who, free of Livo, flipped onto his back so that the two men were on the ground, face to face. At around this time, Officer Schiedel believes he lost his Taser to Mr. Jereb, who then used it "against my face, my neck and maybe down my arm," before Officer Schiedel was able to take it back. *Id.* at 383–84. He estimated that he and Mr. Jereb had been on the ground fighting for about four minutes at this point. Ms. Haanpaa testified that she never saw Mr. Jereb with the Taser, and in fact "[t]he officer never let go of the taser, that I could see." *Id.* at 749.

8

Officer Schiedel commanded Livo to return and told him to bite and hold Mr. Jereb again. He also used his Taser to drive Mr. Jereb back onto his stomach. Still unable to handcuff Mr. Jereb, the fight continued:

> [Officer Schiedel:] At some point from when we were engaged on the left side of the vehicle just behind the driver's side door, I remember Livo biting his right arm. It would have been a full mouth bite. Mr. Jereb, I'm assuming it was his left, it would have to be his left thumb, he was taking his left thumb and trying to get it into the dog's eye. He was jabbing it into his eye, which I would have guessed it was to try to get the dog to come off the bite, to stop biting him at that point.
> THE COURT: What's a full mouth bite?
> [Officer Schiedel:] Your Honor, when I'm referring to a full mouth bite, the rear of the teeth are engaging the forearm all the way. If I would have said frontal, it would have been the canine's shallow on the bite. Full mouth bite is deep. The individual that's being bit is going to have more pain response because the muscles are more powerful towards the rear of the jaw.
> . . . .
> [Officer Schiedel:] When we were—somewhere between the driver's side and his door, there was, I would call it people litter. Somebody had taken a pile of brush up there, like thin sticks, maybe the diameter, large diameter to a pen or pencil, were on the ground in-between the pavement and the dirt itself right alongside my vehicle. Mr. Jereb was picking those up and stabbing the dog in his head and his neck underneath the collar, up underneath his throat, motions that were I would say consistent with if you're using an edged weapon, trying to drive the dog off of him.

*Id.* at 396. Mr. Jereb rose, "almost to his feet," but "Livo brought him down again with his right forearm." *Id.* at 398. Officer Schiedel then got back on top of Mr. Jereb. He held Mr. Jereb face-down on the ground and then pepper sprayed Mr. Jereb in the face. Once the pepper spray deployed, Officer Schiedel felt that Mr. Jereb "was not fighting me as hard anymore to fight me but was fighting to escape." *Id.* at 400. Mr. Jereb was dragging Officer Schiedel and Livo toward a ten-to-twelve foot embankment adjoining Lambs

9

Canyon Creek. Officer Schiedel and Livo disengaged, and Mr. Jereb descended to the creek. Mr. Jereb was retrieved from the creek and taken into custody after backup arrived.

Tricia Hazelrigg, a firefighter and paramedic employed by the Park City Fire Department, was summoned to the scene to assess Officer Schiedel's injuries. But Officer Schiedel refused assessment, and Ms. Hazelrigg did not see any obvious signs that he was physically injured. Ms. Hazelrigg assessed Mr. Jereb instead. Mr. Jereb was cold, wet, and shivering, having fallen or otherwise descended into Lambs Canyon Creek. His lips were blue. He had "obvious little abrasions and superficial marks . . . all over his body," but "nothing that was bleeding profusely or appeared to have any great depth to it." *Id.* at 781–82. Ms. Hazelrigg found Taser probes on the back side of Mr. Jereb's leather jacket. They did not penetrate the jacket and thus did not penetrate his skin, so they "wouldn't have effectively tased him." *Id.* at 785.

As for Officer Schiedel's injuries, Officer Schiedel testified that he suffered a "very minor" laceration on his hand and bruises on various spots on his body, including a black eye.[5] Two days after the incident, Officer Schiedel "realized that [he had] the symptoms of a concussion" and sought medical treatment for the first time, but he says

---

[5] Officer Schiedel also testified about Livo's injuries, which he described as "minor." App. App'x, Vol. III, at 428. On Officer Schiedel's account, Livo had "very small wounds around the neck area, scruff all the way down his shoulders consistent with the stick hits from the small sticks that Mr. Jereb picked up off the ground." *Id.* He didn't notice any deformity or injury to Livo's eye, and Officer Schiedel "[d]idn't get him assessed any more than I got myself assessed." *Id.*

his doctor informed him "the concussion was probably mostly over" at that point. *Id.* at 423–24. Officer Schiedel testified that he does not specifically recall being punched, but that "[m]y head hurt and my face hurt, and I had wounds consistent with being I believe punched in the face." *Id.* at 399–400.

### B.  *Procedural History*

Less than a week after the October 15 incident, a grand jury charged Mr. Jereb with six counts, including assault on a federal officer (in violation of 18 U.S.C. § 111(a)(1) and (b)), harming a law enforcement animal (in violation of 18 U.S.C. § 1368(a)), possession of methamphetamine, heroin and marijuana (each in violation of 21 U.S.C. § 844(a)), and possession of drug paraphernalia on National Forest System Land (in violation of 16 U.S.C. § 551 and 36 C.F.R. 261.53(e)). The case went to trial on April 25, 2016. A jury convicted Mr. Jereb of possessing methamphetamine, heroin, and drug paraphernalia, but acquitted him of harming a police animal and possessing marijuana. The jury also convicted Mr. Jereb of violating 18 U.S.C. § 111(b).

The § 111 conviction—in particular the district court's instructions to the jury regarding that offense—is at the heart of Mr. Jereb's appeal. In its entirety, that statute reads:

> **(a) In general.**--Whoever--
>
>> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

11

(2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

**(b) Enhanced penalty.**--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111. Mr. Jereb was convicted under § 111(b), as the jury unanimously found Mr. Jereb's acts resulted in "bodily injury."

At trial, the parties disagreed on two issues regarding the § 111 jury instructions. First, whether unanimity was required as to how the offense was committed—i.e., whether Mr. Jereb behaved in such a way as to assault, resist, oppose, impede, intimidate, and/or interfere with Officer Schiedel—or whether the jury need agree merely that the offense occurred without requiring agreement on which of § 111(a)(1)'s enumerated acts triggered it. The district court sided with the defendant and instructed the jury that it would need to be unanimous as to which of the § 111(a)(1) acts Mr. Jereb had committed. A special jury instruction was prepared to that effect:

Your verdict must be unanimous. For this first element, the Government does not need to prove all of these different acts—that is, forcibly assault, resist, oppose, impede, intimidate, or interfere—for you to return a guilty verdict. But to return a guilty verdict, all twelve of you must agree upon which of the above acts, if any, the defendant committed and that he committed at least one of those acts.

12

App. App'x, Amended Vol. I, at 65. The district court's jury instructions elsewhere defined "forcibly assault" as "any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent attempt to do so, and includes any intentional display of force that would give a reasonable person cause to expect immediate bodily harm, whether or not the threat or attempt is actually carried out or the victim is injured." It defined "forcibly oppose" as "resist by physical means." The jury unanimously found Mr. Jereb "forcibly opposed" Officer Schiedel, but it did not reach unanimous agreement (to the extent it considered the question at all) as to whether Mr. Jereb also assaulted Officer Schiedel (forcibly or otherwise).

The second issue under dispute related to the requirement that the defendant "forcibly" commit any of the aforementioned prescribed acts. Mr. Jereb raised that issue in conjunction with the possibility that the jury be given a lesser-included-offense instruction for § 111(a)'s simple assault. After further deliberation, however, Mr. Jereb opted against seeking a lesser-included-offense instruction, and the jury was not given the option to convict Mr. Jereb of violating § 111(a) by committing "simple assault."

At sentencing, the district court calculated the base offense level for the § 111 conviction using United States Sentencing Guideline § 2A2.2 (the Guideline for aggravated assault) rather than § 2A2.4 (the Guideline for obstructing or impeding an officer), and Mr. Jereb was sentenced as a career offender under § 4B1.2, based on two prior convictions for Wyoming aggravated assault. *See infra*, n.12. The district court imposed a sentence of seventy-two months and ordered, over Mr. Jereb's objection, participation in a mental health treatment plan as a special condition of supervised

13

release. On appeal, Mr. Jereb initially challenged the district court's application of the Sentencing Guidelines as well as the imposition of mental health treatment. In his reply brief, however, Mr. Jereb conceded that *Beckles v. United States*, 137 S. Ct. 886 (2017), which was decided after the government's answer brief was filed, forecloses his challenges to the district court's application of the Sentencing Guidelines. As a result, Mr. Jereb's objection to mandatory mental health treatment is the only sentencing issue before us on appeal. *See United States v. Pentrack*, 428 F.3d 986, 991 n.4 (10th Cir. 2005) (declining to reach the merits of an argument abandoned in the appellant's reply brief).

## II. DISCUSSION

Mr. Jereb contends that assault is an essential element of every § 111 conviction. Because the jury was not properly instructed as to the assault element—and because the jury verdict form shows the jury did not find that he committed an assault—he argues he is entitled to a new trial. Should his conviction stand, Mr. Jereb asks in the alternative that we reverse the district court's imposition of mental health treatment and remand for resentencing. The remainder of this opinion proceeds in two parts. We consider first the § 111 conviction. Because we find no reversible error, we proceed to consider the district court's imposition of mental health treatment as part of Mr. Jereb's sentence. Finding no reversible error there, either, we affirm the district court's judgment in full.

### A. *The § 111 Conviction*

A district court's decision to give or not give a particular jury instruction is reviewed for abuse of discretion; "however, we review the instructions as a whole de

14

novo to determine whether they accurately informed the jury of the governing law."

*United States v. Sharp*, 749 F.3d 1267, 1280 (10th Cir. 2014). Where a particular

objection to a jury instruction was not raised below, we review only for plain error.

*United States v. Wolfname*, 835 F.3d 1214, 1217 (10th Cir. 2016). Under the plain error

test, a conviction can be reversed "only if (1) an error occurred; (2) the error was plain;

(3) the error affected [the defendant's] substantial rights; and (4) the error seriously

affected the fairness, integrity, or public reputation of a judicial proceeding." *Id.* (internal

quotation marks omitted). The plain error test is inapplicable, however, in the case of

invited error. "Under the invited error doctrine, this Court will not engage in appellate

review when a defendant has waived his right to challenge a jury instruction by

affirmatively approving it at trial." *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th

Cir. 2012).

Mr. Jereb's argument for reversal focuses on the district court's interpretation of

18 U.S.C. § 111, in particular the court's failure to instruct the jury that assault is an

essential element necessary to support a conviction under that statute. He concedes he did

not lodge an on-point objection to the § 111 jury instruction and therefore failed to

preserve the argument he now makes on appeal. As a result, Mr. Jereb asks us to review

the district court's jury instruction for plain error. The government, meanwhile, invokes

the invited error doctrine and asks us not to reach the merits at all. According to the

government, not only did Mr. Jereb fail to preserve his argument below, but he actually

induced the court's error in the first place. To evaluate the government's argument, "we

15

must examine how the verdict form was proposed and approved." *See United States v. Ellis*, 868 F.3d 1155, 1169 (10th Cir. 2017).

Before we do that, however, we pause to address a question raised by the dissent: Does the invited error doctrine apply in this case at all? The dissent would hold that it does not, "because a defendant cannot invite error by providing a district court settled circuit law." Dissent at 4 (citing *United States v. Titties*, 852 F.3d 1257, 1264 n.5 (10th Cir. 2017)). We agree with the general principle. Thus, if Mr. Jereb provided the district court "settled circuit law," only for that settled law to be upended at some later date, the invited error doctrine is per se inapplicable. *Titties*, 852 F.3d at 1264 n.5. In the dissent's view, this is precisely what happened when, four months after Mr. Jereb's trial, a panel of this court decided *Wolfname*. 835 F.3d 1214. Respectfully, we think the dissent is mistaken. In *Wolfname*, we simply *reaffirmed* that "assault is an element of every conviction under 18 U.S.C. § 111(a)(1)." 835 F.3d 1214, 1216 (10th Cir. 2016). From the outset of that opinion, we declared that the parties' dispute—"whether assault is an element of every conviction under 18 U.S.C. § 111(a)(1)"—was "already answered" by the Tenth Circuit in 2003. *Id.* (citing *United States v. Hathaway*, 318 F.3d 1001, 1007–10 (10th Cir. 2003)). We then concluded that "the district court erred in failing to instruct the jury that to convict [defendant] . . . of resisting or interfering with an officer under § 111(a)(1), the jury had to find that [the defendant] assaulted that officer." *Id.* That error, moreover—the same error committed by the district court in this case—we held to be "clear and obvious under *Hathaway*." *Id.* The dissent argues that "we need to read *Hathaway* without the benefit of later interpretations" of that opinion in cases like

16

*Wolfname*, 853 F.3d 1214, and *United States v. Kendall*, 876 F.3d 1264 (10th Cir. 2017).

We disagree. In *Wolfname*, we squarely considered whether, under *Hathaway*, a district court commits "clear and obvious" error by failing to instruct a jury that assault is an element of a § 111(a)(1) conviction. A panel of this court answered that question in the affirmative, and we are bound by its conclusion.[6]

We now turn to the district court proceedings to determine whether Mr. Jereb invited the error he seeks to challenge on appeal. Mr. Jereb proposed the following jury instruction regarding the § 111 charge:

> The first element the government must prove beyond a reasonable doubt is that the defendant "forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with" a federal officer.

> Although the indictment alleges the defendant "forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with" a federal officer, it is not necessary for the government to prove the defendant did all those things, that is, assaulted, resisted, opposed and so forth. It is sufficient if the government proves beyond a reasonable doubt that the defendant did any of those several alternatives as charged. You must, however, be unanimous in your finding of which act or acts has been proven. I will define for you the acts specified by the statute.

> . . . .

_____

[6] Notably, Mr. Jereb concurs that the law was clear and obvious at the time of his trial. *See, e.g.*, Aplt. Br. at 22 ("At the time of Mr. Jereb's trial, the circuit authority was directly on-point, and the statute was equally clear. Assault is an essential element of any § 111 crime."); Aplt. Reply Br. at 5 ("The decision in *Wolfname* did not change the law of the circuit, but rather made explicit what was implicit."). The dissent is "taken aback" by Mr. Jereb's concessions. Dissent at 5 n.3. It speculates that his counsel might mistakenly believe that "to prevail he must show that the error was plain at the time of trial," rather than at the time of our decision on appeal. *Id.* It seems more plausible to us that Mr. Jereb's counsel simply felt bound by *Wolfname*'s gloss on *Hathaway*, as do we.

17

The phrase "forcibly oppose" means to resist by physical means.

. . . .

Proposed Jury Instructions by Aaron Bradley Jereb, *United States v. Jereb*, No. 2:15-cr-00610-TC-1 (D. Utah), ECF No. 38.[7] At trial, the parties and the district court deliberated over the § 111 jury instruction at some length. On appeal, both parties focus on one particular exchange:

> THE COURT: . . . We're meeting without the jury for a jury instruction conference. The attorneys are here. Mr. Jereb waived his right to be present. He will be here sometime around 8:00.
> How I would propose that we proceed is I will say the number of the instruction, and if you have an objection, say objection, and we'll go off the record and try and work it out, and if not, put your objection on the record after I say finally what I'm going to do. If you don't have any objection, just don't say anything and I will just press on because the first ones are pretty much done. . . .
> . . . .
> THE COURT: . . . Okay. Let's go off the record and talk about 18.
> (Discussion off the record.)
> THE COURT: Let's go back on the record.
> 18 will read that to find Mr. Jereb guilty of this crime you must be convinced that, and let's put in that, that the government has proved each of the following elements beyond a reasonable doubt, that Mr. Jereb forcibly assaulted a federal officer or forcibly assaulted—where would I put it in really?
> [PROSECUTOR:] Your Honor, what I would recommend—
> THE COURT: Please.
> [PROSECUTOR:] —is to simply follow the statute and that we state Mr. Jereb forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with.
> THE COURT: Okay.

---

[7] Neither party included Mr. Jereb's proposed jury instructions in the appellate record. Because they are material to whether he invited error, we sua sponte supplement the appellate record to include them. *See* Fed. R. App. P. 10(e)(2)(C); *United States v. Polly*, 630 F.3d 991, 995 n.1 (10th Cir. 2011); *see also* Fed. R. App. P. 30(a)(2).

[PROSECUTOR:] Your Honor, I also have a Tenth Circuit case, 2006, where the jury instruction read the defendant forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with an officer in—

THE COURT: **In other words, just follow the language of the statute. Does that work?**

[DEFENSE COUNSEL:] **I am fine with that.**

THE COURT: Okay. Mr. Crapo, did you get that?

THE LAW CLERK: Yes. Forcibly assaulted and then adopt the slew of verbs that follow.

THE COURT: Resisted, opposed, impeded, intimidated or interfered with a federal officer, and then in our next couple of instructions we have to make clear that the resist, opposed, impeded are all modified with forcibly. Okay. 18 is taken care of.

App. App'x, Vol. III, at 643, 646–47 (emphasis added). But Instruction No. 18 was not taken care of. The government points to a second extended exchange recorded soon thereafter:

[DEFENSE COUNSEL:] Your Honor, at this point I am not sure if we want to discuss it, but as to the second element—the first element, we believe that the jury would have to make a unanimous finding as to which of those acts he committed.

THE COURT: Yes, and that is going to reflect—we probably need the jury instruction that says that as well as the verdict form. Okay.

[PROSECUTOR:] Your Honor, we take issue as to unanimity.

. . . .

THE COURT: All right. What is your response, defense?

[DEFENSE COUNSEL:] Your Honor, I would just say, first of all, I think **the plain language of the statute suggests that these are separate methods by which you could commit this crime**. The title of the statute lists a couple of them and then the body of the statute lists a couple more. When I read them in a series like that and knowing that forcibly qualifies each of them, when I read it, I read them as you do, that they are **separate offenses**. If they are, if they are separate elements or distinguishable elements, I think the law requires that the jury be unanimous as to which element they find because it is an element of conviction.

It is a necessary element that they find one or the other, and I don't think this is the kind of case in which we have something like malice that is a general term that can be done in a bunch of different ways and the jury gets an instruction on ways it could make a finding as to one particular element. If we were talking about assault and the statute defined assault as

19

all these different forms of conduct, I think the government would have a good point, but in this case it appears that **Congress has attempted to distinguish all the particular acts that could constitute this crime**.

. . . .

[PROSECUTOR:] . . . The one thing I would add, Your Honor, is that the *Kimes* case in the Sixth Circuit talks about how having a unanimity instruction in 111 could make things actually more confusing for the jury rather than provide clarity to the jury. That was one of the reasons that they didn't think it was necessary in a 111 case.

[DEFENSE COUNSEL:] But when I think about that, **you could have jurors back there, some of which who believe there is a resisting case, some of which believe there is an assault case, and he should not be convicted if there is a compromise or a split in terms of how they perceive the evidence. There should be unanimity in how they interpret the evidence and how he committed the crime, if he has**.

*Id.* at 649, 652–54 (emphasis added).

The government argues these exchanges show Mr. Jereb taking a position below directly contrary to the position he now adopts on appeal. Mr. Jereb responds that the government is eliding its own complicity in misreading the statute and cherry-picking statements made by the defense counsel stripped from their proper context.[8] As Mr. Jereb tells it, trial counsel's statements all related to two tangential disputes regarding § 111 not relevant on appeal—i.e., whether the jury had to be unanimous about the course of conduct Mr. Jereb undertook in violation of § 111, *see id.* at 649–56, and the definition of "forcibly," *see id.* at 657–68. In the midst of all the discussion regarding § 111, Mr. Jereb stresses, the parties never explicitly addressed the purported error that is challenged on appeal—whether assault is an essential element of a § 111(b) conviction.

---

[8] In order to fairly consider Mr. Jereb's assertion of cherry-picking, we have quoted at some length from the trial transcript. The defense counsel statements quoted in the government's answer brief are in bold.

This case thus forces us to consider the scope of the invited error doctrine. We do not write on a blank slate. "The invited-error doctrine prevents a party who induces an erroneous ruling from being able to have it set aside on appeal." *United States v. Morrison*, 771 F.3d 687, 694 (10th Cir. 2014) (citation omitted). It is "based on reliance interests similar to those that support the doctrines of equitable and promissory estoppel." *Id.* (citation omitted). "Having induced the court to rely on a particular erroneous proposition of law or fact, a party may not at a later sta[g]e use the error to set aside the immediate consequences of the error." *Id.* (citation omitted).

Both parties cite *United States v. LaHue*, a case in which numerous defendants were tried together for conspiracy to violate the Medicare Antikickback Act and other related crimes. 261 F.3d 993, 1001 (10th Cir. 2001). Among the defendants were two attorneys who represented a hospital that employed several of their alleged co-conspirators. *Id.* at 997. At the close of the government's case, the district court granted the attorneys' motions for acquittal. *Id.* at 1001. The case proceeded as to the remaining defendants and at closing argument the government stated that the acquitted "attorneys were well aware that . . . this was a paying for patients deal and worked to develop agreements that covered up that fact." *Id.* at 1011. Defense counsel argued they should be allowed to inform the jury the attorney defendants were acquitted. *Id.* at 1012. The trial court agreed, and defense counsel took advantage of that ruling by claiming in their own closing argument that the attorneys' acquittal created reasonable doubt as to their clients' guilt. *Id.* Apparently unpersuaded, the jury convicted four defendants of the conspiracy charge. *Id.* at 1001. At least two of those defendants thereafter moved for a new trial on

21

the ground that the variance between the indictment of the attorneys and the attorneys' acquittal at the close of the government's case substantially prejudiced them, entitling them to a new trial. *Id.* at 1010. The district court denied that motion. *Id.* at 1011.

On appeal those two defendants argued again that the variance between the indictment and the attorneys' acquittal substantially prejudiced their right to a fair trial. *Id.* at 1007–10. Invoking the invited error doctrine, we affirmed the district court's refusal to grant a new trial because, *inter alia*, the defendants' argument on appeal was "a complete reversal from the position they sought to and did assert during closing argument." *Id.* at 1013. Because the defendants "affirmatively sought the opportunity to argue about the acquittal of the attorney defendants, rather than object to the government's argument and have it stricken along with an instruction from the court for the jury to disregard the argument," we concluded the invited error doctrine applied and so the defendants could not argue the opposite position on appeal. *Id.* at 1012–13.

*LaHue* tends to support the government's argument that the invited error doctrine applies here. Mr. Jereb asserts that *LaHue* is inapposite because he "did not argue that simple assault was not an essential element of the charge, nor did he propose any instruction that contradicts his position on appeal." Aplt. Reply Br. 10. But, as we have said, Mr. Jereb proposed an instruction stating that "it is not necessary for the government to prove the defendant . . . *assaulted*, resisted, opposed and so forth. It is sufficient if the government proves beyond a reasonable doubt that the defendant did *any* of those several alternatives as charged." ECF No. 38 (emphasis added). This instruction "contradicts his position on appeal." Aplt. Reply Br. 10. The record further reflects that he meaningfully

22

participated in crafting the jury instruction actually given at trial, which reflected the language Mr. Jereb sought.

Our opinions in *Cornelius*, 696 F.3d 1307, and *United States v. Smith*, 454 F. App'x 686 (10th Cir. 2012) (unpublished), are also instructive. In those cases, two different panels of this court considered separate appeals from the same trial, in which the defendant-appellants (one Corey Cornelius and one Jonearl B. Smith) separately challenged the same jury instruction, which informed the jury it need not find an "enterprise" actually existed in order to convict for conspiracy to commit a RICO violation. *Cornelius*, 696 F.3d at 1313; *Smith*, 454 F. App'x at 689. During deliberations the jury propounded a question aiming to clarify whether an enterprise must exist in order to convict for conspiracy. *Cornelius*, 696 F.3d at 1314. The district court responded in the negative. *Id.* at 1314–15. Mr. Smith's counsel objected to the district court's response, arguing the new instruction lent undue emphasis to instructions already given.[9] *Id.* at 1315; *see also Smith*, 454 F. App'x at 691. Mr. Smith's counsel requested the judge respond to the jurors' question simply by instructing them to reread the instructions already received. *Cornelius*, 696 F.3d at 1320. When the judge asked whether the court's clarifying response contained a misstatement of the law or would in fact mislead the jury, Mr. Smith's counsel replied in the negative. *Id.* at 1320; *see also Smith*, 454 F. App'x at

---

[9] Mr. Cornelius's counsel expressly adopted the objections and positions stated by Mr. Smith's counsel. *See United States v. Cornelius*, 696 F.3d 1307, 1320 (10th Cir. 2012).

23

692 ("Smith stated this proposed response did not 'to [his] knowledge' misstate the law." (quoting the record) (alteration in original)).

*Smith* was decided first, and in an unpublished opinion a panel of this court rejected the government's invocation of the invited error doctrine. *Smith*, 454 F. App'x at 691–92. Because Mr. Smith "did not affirmatively urge the court to inform the jury that an enterprise need not be established in order to convict," the court perceived no invited error and proceeded to the merits of Mr. Smith's argument, which it found lacking under the plain error test. *Id.* at 692–97.

In *Cornelius*, a different panel saw the same facts in a different light. In that case, we found the same argument considered on the merits in *Smith* "fails . . . under the invited error rule, because Cornelius waived his right to challenge the jury instruction on appeal by expressly endorsing it at trial." *Cornelius*, 696 F.3d at 1319. We noted *Smith*'s contrary holding; observing that it was not binding precedent, we proceeded to find Mr. Cornelius's counsel (acting through Mr. Smith's counsel) "expressly endorsed" the original jury instruction, which contained the statement of law attacked on appeal. *Id.* at 1320. By "implor[ing] the trial judge to instruct jurors to return to this now-challenged jury instruction," the defendant endorsed that instruction and thus invited the error he later sought to challenge on appeal. *Id.*

*Cornelius*, not *Smith*, is binding precedent, and the contrast between the holdings in the two cases demonstrates the robustness of our invited error doctrine. Nothing on the face of either opinion suggests defense counsel proposed or participated in the drafting of the original jury instruction. Rather, defense counsel (1) objected to a clarifying

24

instruction from the court on the ground that the original jury instructions should be sufficient to guide the jury, and (2) replied in the negative when the judge asked whether the clarifying instruction contained a misstatement of the law or would in fact mislead the jury. Those actions were enough to convert the initial failure to object, a forfeiture that would be subject to plain error review, into an invited error that precludes appellate review. *See Cornelius*, 696 F.3d at 1319. In this case, Mr. Jereb did much more—he requested (and received) jury instructions construing a statute that contradict the construction he now prefers on appeal.

The dissent would distinguish *Cornelius* on the ground that "the issue complained of on appeal was exactly the one that the defendant had expressly adopted in the district court," while Mr. Jereb, by contrast, "never adopted the position that assault is *not* an element of the other five methods of violating § 111(a)(1)." Dissent at 9. But the dissent's use of a double negative to explain Mr. Jereb's position reflects the same rhetorical move taken in *Smith*, *see* 454 F. App'x at 692 ("Smith did *not* affirmatively urge the court to inform the jury that an enterprise need *not* be established in order to convict . . ." (emphasis added)). We repudiated that position in *Cornelius*, *see* 696 F.3d at 1319, and *Smith* and *Cornelius* are not distinguishable. They arise from identical facts, described differently. In *Smith*, as in the dissent, we encounter a double negative because if the same idea were rewritten in the affirmative, the contradiction between the position adopted at trial and the position adopted on appeal would be apparent. But "[i]t has long been a convention of the English Language—as with arithmetic and logic—that two negatives make a positive." *Duquesne Light Holdings, Inc. & Subsidiaries v. Comm'r of*

25

*Internal Revenue*, 861 F.3d 396, 421 (3d Cir. 2017) (Hardiman, J., dissenting) (collecting examples). This feature is telling—the contradiction between Mr. Jereb's position below and his position on appeal is real, because the underlying ideas are themselves in conflict. And that contradiction in ideas persists regardless of the words we use to describe them. Mr. Jereb argues that the invited error doctrine is inapplicable because he "did not argue that simple assault was not an essential element of the charge." Aplt. Reply Br. at 10. What he did argue, however, directly contradicts his argument on appeal that assault is an element of every § 111 conviction: If the jury could convict upon a unanimous finding of one of the other means of violating the statute, it necessarily need not find assault in every case. The dissent's reasoning is the same reasoning that explains the outcome in *Smith*. In light of *Cornelius*'s rejection of *Smith*, *Cornelius* controls the outcome in this case.

Other Tenth Circuit cases also support our conclusion that the invited error doctrine applies in cases such as this one, where the defendant requested the jury instruction he later challenges on appeal. In *United States v. Sturm*, we considered a challenge to the district court's jury instruction that "the mere act of observing child pornography, without possession or receipt, is not illegal." 673 F.3d 1274, 1280 (10th Cir. 2012). On appeal the defendant argued, for the first time, that the failure to provide an instruction defining the term "receives" rendered that instruction ineffective. Because the defendant "proffered the challenged instruction himself," his attack on the sufficiency of that instruction was barred. *Id.* at 1280–81. Likewise, in this case, Mr. Jereb proffered an instruction that he now challenges on appeal. *Sturm* and *Cornelius* teach that a

26

challenge of this sort is barred.[10] *See also United States v. Harris*, 695 F.3d 1125, 1130 n.4 (10th Cir. 2012) ("A defendant's failure to object to a district court's proposed jury instruction, or even the affirmative statement, 'No, Your Honor,' in response to the court's query 'Any objection?', is not the same as a defendant who proffers his or her own instruction, persuades the court to adopt it, and then later seeks to attack the sufficiency of that instruction."). In light of the foregoing, we hold that Mr. Jereb's challenge to the § 111 jury instruction is precluded by the invited error doctrine.

### B.   *The Imposition of Mental Health Treatment*

"When the defendant objects to a special condition of supervised release at the time it is announced, this Court reviews for abuse of discretion." *United States v. Bear*, 769 F.3d 1221, 1226 (10th Cir. 2014). "Thus, we will not disturb the district court's ruling absent a showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Id.* (internal quotation marks omitted). Although we are "not hypertechnical" in requiring a district

---

[10] The dissent would distinguish *Sturm* because, in that case, "the issue of 'receives' and 'receipt' was apparent, not hidden in a jumbled statute like 18 U.S.C. § 111(a)(1)," and "[s]o, unlike Jereb, Sturm had surveyed the landscape and chosen his route." Dissent at 10 n.9. We see two problems with this analysis. First, nothing in *Sturm* indicates that Mr. Sturm or his counsel had given a moment's thought to how (or whether) "receipt" should be defined for the jury. The dissent postulates that Mr. Sturm "chose to deal with this known issue by informing the jury that observing child pornography without possession or receipt is not illegal." *Id.* But the instruction left "receipt" undefined. We have no idea whether that omission was a tactical decision or a failure to consider the issue at all. Second, as we have already explained, the record in this case makes clear that Mr. Jereb, through his counsel, thought strategically about how he wanted § 111 to be defined. In fact, as the dissent notes, in securing a favorable unanimity instruction he "did better than he should have." *Id.* at 8 & n.6.

27

court to explain why it imposed a particular condition of supervised release, we do require "at least generalized reasons" so that we can conduct a proper review. *United States v. Martinez-Torres*, 795 F.3d 1233, 1236, 1238 (10th Cir. 2015).

District courts enjoy broad discretion to order special conditions of supervised release, including mandatory mental health treatment. *See* 18 U.S.C. §§ 3583(d), 3563(b)(9). Section 3583(d) limits the district court's exercise of that discretion, however, in three ways. First, the special condition must be "reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)." *See* 18 U.S.C. § 3583(d)(1). Second, the condition must involve "no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)." *See* 18 U.S.C. § 3583(d)(2). By cross-referencing § 3553, we understand § 3583(d)(1) and (2) to mean that any special condition must be reasonably related to at least one of the following four factors and involve no greater deprivation of liberty than is reasonably necessary to effectuate the purposes of the latter three factors:

- the nature and circumstances of the offense and the history and characteristics of the defendant, *see id.* § 3553(a)(1);

- the need to afford adequate deterrence to criminal conduct, *see id.* § 3553(a)(2)(B);

- the need to protect the public from further crimes of the defendant, *see id.* § 3553(a)(2)(C); and

- the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, *see id.* § 3553(a)(2)(D).

*See United States v. Barajas*, 331 F.3d 1141, 1146–47 (10th Cir. 2003) (holding that while the district court should consider each § 3553(a) factor, a special condition need not be reasonably related to all of the factors so long as it is reasonably related to at least one). The third way in which § 3583(d) cabins the district court's exercise of discretion is that the special condition must be consistent with any pertinent policy statements issued by the Sentencing Commission. *See* 18 U.S.C. § 3583(d)(3). This latter test is clearly met in this case, as the Sentencing Guidelines affirmatively recommend a defendant be required to participate in a mental health program approved by the United States Probation Office if the court "has reason to believe that the defendant is in need of psychological or psychiatric treatment." *See* USSG § 5D1.3(d)(5); *see also Barajas*, 331 F.3d at 1145.

Our analysis will proceed as follows: First, we consider the district court's explanation for imposing mental health treatment as a special condition of supervised release and its related findings. Second, we examine whether imposing mental health treatment is reasonably related to any of the § 3553(a) factors enumerated above. *See* 18 U.S.C. § 3583(d)(1).[11]

---

[11] Mr. Jereb does not argue mental health treatment imposes a greater deprivation of liberty than is reasonably necessary for the purposes of deterrence, protecting the public, and/or rehabilitation. Therefore, we do not address whether the district court abused its discretion under 18 U.S.C. § 3583(d)(2).

1.     **Did the district court adequately explain its reasons for imposing mental health treatment such that this court can conduct a proper review?**

The district court must "provide at least generalized reasons for imposing special conditions of supervised release." *Martinez-Torres*, 795 F.3d at 1236. But we are "not hypertechnical in requiring the court to explain why it imposed a special condition of release." *Id.* at 1238. A statement of generalized reasons is enough, provided the district court's explanation is sufficient to allow proper appellate review. *Id.*

Upon Mr. Jereb's objection at sentencing, the district court explained its reasoning for requiring mental health treatment:

> I'm going to put that still as a condition. Mr. Jereb is very stoic. Something has caused Mr. Jereb to go off the rail at times. I think it's not just drugs. I think there is something underlying. I don't know whether it's in the fact that—I don't know what. I'm not a psychologist. But I think that you could benefit. And if your probation officer doesn't think you need it, he won't or she won't advise it.

App. App'x, Vol. III, at 95–96. On appeal Mr. Jereb zeroes in on this explanation in response to his objection and argues that it is insufficient. Stoicism, he says, is consistent with judicial expectations of courtroom decorum, and so the district court's explanation is unsatisfying. Taken in isolation the above-quoted explanation in response to Mr. Jereb's objection probably would not allow for meaningful appellate review. *See Martinez-Torres*, 795 F.3d at 1238.

Mr. Jereb oversteps, however, because the above-quoted passage was not the only explanation given by the district court. Earlier in the sentencing hearing, the district court had the following exchange with the prosecutor:

[PROSECUTOR:] . . . [S]omething of great concern to us is the PSR paragraph 68 that he has no desire for treatment.

THE COURT: I know. Despite your wishes, Mr. Jereb, I'm going to recommend treatment. You are free to refuse it. But I think you do need it. But you are the controlling person. I know [the Bureau of Prison's Residential Drug Abuse Program] isn't going to take you if you don't want to go. I certainly think that might help.

[PROSECUTOR:] That plays into another concern of ours, which we actually think the Court can take this into consideration for a departure as well, but, again, it raises a heightened concern to us is PSR paragraph 6[8], he doesn't feel he needs mental health treatment. Counsel again has referred to diminished capacity. I think it would be extremely important for him to get a psychiatric evaluation, psychological, psychiatric evaluation, neuropsychological evaluation. His history, especially I think he started out in juvenile court or some type of juvenile offender thing at 13, and I believe he was raised by his grandparents.

THE COURT: Here's a question and I'm going to ask it. I won't be asking Mr. Jereb, but I'm going to ask [defense counsel]. He said he had loving grandparents and no problems. Yet here he is, early on, going off the rails.

[PROSECUTOR:] That's what brings me back to the question of his mental health.

This has been a case that we have agonized over, Your Honor. We want to be fair. We want to be appropriate in our recommendations.

. . . .

THE COURT: . . . I think you would benefit and I think society would benefit if you could get out of this enjoying drugs and going on your binges. And I think mental health counseling is also an important consideration. You lose your temper, and that's exacerbated when you have been using drugs.

App. App'x, Vol. III, at 75–76, 92–93. The court then ordered Mr. Jereb to "[p]articipate in a mental health treatment program under a co-payment plan" and "[t]ake any medications that are prescribed for mental health" as part of his sentence. *Id.* at 94. Together with the district court's response to Mr. Jereb's objection, these excerpts of the sentencing transcript relay the full extent of the district court's explanation for imposing mental health counseling. Mr. Jereb says it is not enough. He asserts the district court

"did not connect the dots between the special condition of mental health treatment and any of the factors identified in § 3583(d)." Aplt. Br. at 40. That much is true. The district court did not connect the special condition of mental health treatment to the § 3583(d) factors, at least not explicitly.

Still, it is possible to glean the factors the district court considered from careful examination of the record. In response to the government's recommendation that Mr. Jereb receive a mental health evaluation, the district court acknowledged that Mr. Jereb was "going off the rails" "early on" in his life. Considering that comment, together with the district court's observation of Mr. Jereb's demeanor in the courtroom (his stoicism), we can infer the district court believed mental health counseling was reasonably related to Mr. Jereb's "history and characteristics." *See* 18 U.S.C. § 3553(a)(1).

We can also infer the district court believed mental health treatment was reasonably related to protecting the public. *See* App. App'x, Vol. III, at 92–93 ("I think you would benefit and I think society would benefit if you could get out of this enjoying drugs and going on your binges. And I think mental health counseling is also an important consideration. You lose your temper, and that's exacerbated when you have been using drugs."). In finding Mr. Jereb's tendency to lose his temper is "exacerbated" by his drug use, the district court signaled that it viewed Mr. Jereb's temper as a problem distinct from his drug habit and thus something that mental health counseling could potentially address.

Other record sources provide further context for the district court's comments at the sentencing hearing. The Presentence Investigative Report ("PSR") details Mr. Jereb's

history of violent behavior,[12] which the district court equated to "going off the rails." The district court found no ready explanation for this behavior in light of the representation in the PSR that Mr. Jereb was raised by loving grandparents. It is thus fair to infer the district court deemed mental illness the likely explanation for Mr. Jereb's repeated incidents of "going off the rails." To be sure, the PSR states that Mr. Jereb has never been under the care of mental health professionals and it did not recommend mental health treatment. The PSR also reports Mr. Jereb denied any past or present thoughts of suicide and Mr. Jereb does not believe he is in need of mental health counseling. But the district court was free to view Mr. Jereb's demeanor and history of violent outbursts as suggestive of underlying mental health issues unrecognized by Mr. Jereb and, as yet, undiagnosed by a medical professional.

---

[12] According to the Presentence Investigation Report ("PSR"), in 1998, when Mr. Jereb was sixteen years old, he was arrested for, charged as an adult, and later convicted of felony aggravated assault. Mr. Jereb drove his truck through a crowd of people, striking six of them and completely running over a female victim. Mr. Jereb continued forward and slammed into another truck containing four individuals.

In 2005, when Mr. Jereb was twenty-three years old, he was again arrested for and later convicted of felony aggravated assault. This time Mr. Jereb, drinking with his victim at a bar, continually asked the victim to go outside and fight him. After the victim obliged and Mr. Jereb and the victim stepped outside, Mr. Jereb hit the victim. After a witness told them to stop fighting, Mr. Jereb, the victim, and the witness got into a vehicle and drove to a remote location to continue the fight. Mr. Jereb then stabbed his victim. The victim tried to run away but fell, at which time Mr. Jereb climbed on top of him and stabbed him again in the chest. The victim and Mr. Jereb continued to fight and the victim was stabbed again in the stomach. The victim managed to get the knife away from Mr. Jereb and pinned him down. Officers then arrived at the scene, and the victim stated that during the assault Mr. Jereb told him, "die mother fucker."

In 2006, when Mr. Jereb was twenty-four years old and incarcerated, he was convicted of simple assault and battery after correctional officers witnessed him throwing punches at another inmate's face.

Although the record could be clearer, we conclude the district court provided an adequate explanation of "generalized reasons" sufficient to enable us to conduct a proper review. The transcript of the sentencing hearing shows the district court considered Mr. Jereb's temperament in court, his upbringing, his proclivity for losing his temper, and his propensity for going "off the rails," when choosing to make mental health treatment a condition of supervised release. We see little merit in remanding for the purpose of explicitly "connect[ing] the dots," Aplt. Br. at 40, between mental health treatment and the § 3583(d) factors, when the district court has already said enough to enable us to conduct that elementary task. *See United States v. Hahn*, 551 F. 3d 977, 983 (10th Cir. 2008) (rejecting claim that district court did not provide sufficient reasons for imposing special sex offender conditions where the district court explained they were being imposed based on "the history and characteristics of the defendant" and the recency of the defendant's sexual crimes).

**2.      Is the imposition of mental health treatment reasonably related to at least one of the statutory factors?**

On appeal, the government does not argue mental health treatment is reasonably related to either deterrence, 18 U.S.C. § 3553(a)(2)(B), or rehabilitation, *id.* § 3553(a)(2)(D). Instead, the government contends the special condition is reasonably related to Mr. Jereb's history and characteristics, *id.* § 3553(a)(1), and protecting the public, *id.* § 3553(a)(2)(C). Because we conclude the special condition is reasonably related to Mr. Jereb's history and characteristics, we do not consider the government's argument that it is also related to protecting the public.

34

The government argues mental health treatment is reasonably related to Mr. Jereb's history and characteristics as well as the § 111 offense for which he was convicted. For his part, Mr. Jereb takes umbrage with the government's suggestion that "there is often a link between mental illness and violent conduct," calling it an inflammatory assertion devoid of any support.[13] But in fact we have previously held a defendant's "long record of violent incidents" can support a conclusion that mental health counseling is appropriate. *See Barajas*, 331 F.3d at 1147. Other courts of appeals are in accord. *See United States v. Lopez*, 258 F.3d 1053, 1057 (9th Cir. 2001) (finding that the record "amply supports the district court's belief that [defendant] needed mental health counseling," where, *inter alia*, the district court "observed [defendant] in his appearances and" the defendant "had a history of violent criminal behavior"); *United States v. Bull*, 214 F.3d 1275, 1278 (11th Cir. 2000) (finding district court did not abuse its discretion in requiring mental health treatment where presentence report indicated defendant had prior convictions for domestic battery and was involved in other incidents involving threats or violence); *but see United States v. Pruden*, 398 F.3d 241, 249 (3d Cir. 2005) ("[A] long criminal history . . . alone cannot demonstrate a need for mental health treatment—for if it did, virtually any repeat offender could be required to undergo such treatment.").

---

[13] Mr. Jereb notes the government's "inflammatory" argument was not raised at sentencing, but he advances no argument as to why that is relevant. As always, we are free to affirm on any ground adequately supported by the record. *See Tooele Cty. v. United States*, 820 F.3d 1183, 1191 (10th Cir. 2016).

And there is evidence aplenty in the record establishing Mr. Jereb's history of violent criminal behavior. *See supra*, n.12. Although not needed under *Barajas*, the record also supports the district court's finding of something amiss in Mr. Jereb's mental state. At trial, Officer Schiedel testified that Mr. Jereb's behavior leading up to the fight was unusual, marked by "wild eyed" stares and unexplained silences.[14] And Ms. Haanpaa testified that Mr. Jereb's paranoia "skyrocketed" during the relevant period, sometimes causing him to believe she was someone else. App. App'x, Vol. III, at 690–91. Of course the district court also had its own opportunity to observe Mr. Jereb in court throughout the four days of trial. The district court explicitly took its own observations into account in fashioning its sentence, as it was permitted to do. *See Lopez*, 258 F.3d at 1057 (holding the record amply supported the need for mental health counseling where, *inter alia*, the district court observed the defendant in his appearances).

In arguing the district court abused its discretion, Mr. Jereb relies principally on *United States v. Majors*, an unpublished opinion in which we reversed the imposition of mental health treatment as a condition of supervised release where there was no evidence that the defendant was in need of such treatment. *See* 426 F. App'x 665, 669 (10th Cir. 2011). But *Majors* is not precedential and it is distinguishable because the defendant in that case was not convicted of a violent crime and the record showed no history of violent behavior. *Id.*at 666, 669. Where, as here, the record demonstrates a track record of violent

---

[14] At the sentencing hearing, the district court repeatedly stated that it found Officer Schiedel to be a credible witness.

behavior, a district court does not abuse its discretion in finding mental health treatment reasonably related to the defendant's history and characteristics. *See Barajas*, 331 F.3d at 1147 ("Defendant's long record of violent incidents supports the district court's conclusion that Defendant needed mental health treatment."). As Mr. Jereb himself notes, a defendant cannot be caught off guard by a court's decision to require mental health counseling when the PSR contains extended descriptions of violent behavior.

We hold that the district court did not abuse its discretion in finding mental health treatment reasonably related to the nature and circumstances of the offense as well as Mr. Jereb's history and characteristics. Because mental health treatment is reasonably related to 18 U.S.C. § 3553(a)(1), it is not necessary for it to also be reasonably related to any of the other statutory factors and we do not consider them. *See Barajas*, 331 F.3d at 1146.

\*

We affirm the imposition of mental health treatment as a special condition of supervised release. The district court provided an explanation adequate for this court to conduct a proper review. Upon conducting that review, we conclude the district court did not abuse its discretion in finding mental health treatment reasonably related to Mr. Jereb's history and characteristics as well as the circumstances of the offense.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Jereb's conviction and sentence.

37

*United States v. Jereb*, No. 16-4127

**PHILLIPS**, J., concurring and dissenting.

I agree with the majority's disposition of the supervised-release issue. But I disagree with its applying the invited-error rule to defeat Jereb's meritorious plain-error argument concerning the disputed jury instruction.

## Plain Error

On appeal, Jereb challenges his conviction for forcibly opposing[1] a federal officer acting in the course of his duties, as charged under 18 U.S.C. § 111(a)(1), (b).[2] With the parties' assent, the district court instructed the jury on what the parties and court thought were the elements of the crime. Unsurprisingly, the instruction tracked the statute, which forbids "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], or interfer[ing]" with a federal officer. *See* 18 U.S.C. § 111(a). In accordance with the practice in our circuit, the

---

[1] The Judgment states that the jury found Jereb guilty of "Assault on a Federal Officer." R. vol. 1 at 145. The jury left blank the spaces on the special-verdict form by which it could have found that Jereb had forcibly assaulted, forcibly resisted, forcibly impeded, forcibly intimidated, or forcibly interfered with the officer. *Id.* at 98.

[2] In recounting the jury's findings, the majority says that "[t]he jury also convicted Mr. Jereb of violating 18 U.S.C. § 111(b)." Maj. op. at 1. Because the government contends in its brief that subsection (b) is a stand-alone crime, I think we should clarify that the government in fact correctly charged the crime under 18 U.S.C. § 111(a)(1), (b), that is, that a conviction under § 111(b) requires proof of the elements contained in both subsections. If we don't, then we encourage the government to continue arguing this same point in future cases—relying on dicta arguments and the like. *See* Appellant's Br. at 27–33. I recognize that *United States v. Kendall*, 876 F.3d 1264, 1265 (10th Cir. 2017), referred to a "conviction under 18 U.S.C. § 111(b)," but I view this as a shorthand reference. After all, *Kendall* looked back to § 111(a)(1)'s six methods before declaring that assault is a required element of an enhanced penalty under subsection (b). *Id.* at 1270.

district court did not additionally instruct the jury that forcibly resisting, opposing, impeding, intimidating, or interfering with a federal officer required concomitant proof of an assault. But after Jereb's trial, our circuit began requiring that the government prove assault in addition to proving any of the other five listed acts. *See United States v. Kendall*, 876 F.3d 1264, 1270 (10th Cir. 2017) (acknowledging that "one can violate § 111 in a number of ways" and concluding that "every conviction under § 111 requires an assault"); *United States v. Wolfname*, 835 F.3d 1214, 1218 (10th Cir. 2016) ("[b]ecause a § 111(a)(1) conviction for resisting, opposing, impeding, intimidating, or interfering must fall into one of . . . two categories [simple assault or "all other cases" assault,] a conviction for any of these acts necessarily involves—at a minimum—simple assault."). Though we decided *Kendall* and *Wolfname* after Jereb's trial, he gets the benefit of those rulings because his case is on direct appeal. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).

Because Jereb did not object on the ground that the jury needed to find that he assaulted the officer in addition to forcibly opposing him, we review this legal challenge for plain error. Under the plain-error standard, Jereb must establish that "(1) an error occurred; (2) the error was plain; (3) the error affected [his] substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of a judicial proceeding." *Wolfname*, 835 F.3d at 1217 (quoting *United States v. Makkar*, 810 F.3d 1139, 1144 (10th Cir. 2015)).

Here, Jereb easily satisfies the first two prongs of the analysis. Under *Kendall*, the district court plainly erred by not requiring the jury to find that Jereb had assaulted the

federal officer in addition to opposing him. *See Kendall*, 876 F.3d at 1270 (citing *Wolfname*, 835 F.3d at 1218). At the third prong, Jereb should also prevail. To show substantial prejudice, he "must demonstrate 'a reasonable probability that but for the error claimed, the result of the proceeding would have been different.'" *United States v. Hill*, 749 F.3d 1250, 1263 (10th Cir. 2014) (quoting *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005)). The jury declined to find that Jereb had assaulted the officer. Thus, had the district court properly instructed the jury, the government necessarily would have failed to show that Jereb assaulted the officer in addition to opposing him.

Finally, at the fourth prong, we have discretion to notice the forfeited error. *United States v. Olano*, 507 U.S.725, 736 (1993) ("The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936))). Though we will not always notice the error resulting from failing to instruct the jury on an essential element of the crime, "we have before noted that reversal is appropriate when evidence supporting the omitted element is 'neither overwhelming nor uncontroverted.'" *United States v. Benford*, 875 F.3d 1007, 1021 (10th Cir. 2017) (quoting *Wolfname*, 835 F.3d at 1223). Here, as stated, the evidence is the opposite of overwhelming—the jury declined to find that Jereb had assaulted the federal officer. For those reasons, I would conclude that Jereb has met his burden under the plain-error standard and deserves reversal of his 18 U.S.C. § 111(a)(1), (b) conviction.

3

**Invited Error**

For two reasons, I disagree with the majority's view that Jereb invited the error identified above.

First, at the time of Jereb's trial, the settled law and pattern jury instruction in our circuit favored the instruction the parties offered. Before *Wolfname*, which we decided four months after Jereb's trial, our circuit had treated each of the listed ways of violating § 111 (the defendant "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" the federal officer) as "assault" in applying the penalty. *See, e.g.*, *United States v. Sherwin*, 271 F.3d 1231, 1233 (10th Cir. 2001) (referring to a charge under § 111(a)(1), (b) with the six methods of committing the crime as "one count of assaulting federal officers"); *United States v. Afflerbach*, 754 F.2d 866, 868–69 (10th Cir. 1985) (affirming a conviction for "forcibly interfering with a federal officer without the use of a deadly weapon," apparently without a jury finding that the defendant had assaulted the federal officer while interfering with him); *United States v. Linn*, 438 F.2d 456, 458 (10th Cir. 1971) (affirming a conviction, apparently without a special verdict, on a charge listing all six methods of committing the offense and commenting that "[o]ne of the elements of the offense proscribed by § 111 is that the federal officer assaulted be engaged in the performance of his official duties and not on a frolic of his own"); *Taylor v. United States*, 334 F.2d 386, 388 (10th Cir. 1964) (affirming a conviction, apparently with no special verdict, on a charge listing all six methods of committing the offense and generally describing the offense as assault).

4

This matters because a defendant cannot invite error by providing a district court settled circuit law. *See United States v. Titties*, 852 F.3d 1257, 1264 n.5 (10th Cir. 2017). The question thus becomes whether any authority unsettled this law before Jereb's trial. The government contends that *United States v. Hathaway*, 318 F.3d 1001 (10th Cir. 2003), did so.[3] I disagree.

In evaluating whether *Hathaway* changed the settled law in our circuit on the concomitant-assault issue, we need to read *Hathaway* without the benefit of later interpretations of it in *Wolfname* and *Kendall*. By backing the analysis to the time of Jereb's trial, and not fast-forwarding to *Wolfname*, a different picture emerges. If relying just on *Hathaway*, contemporary readers would have seen that the government charged that Hathaway "did knowingly and intentionally forcibly assault, resist, oppose, impeded [sic], intimidate, and interfere with" a federal officer. *Id*. at 1004. They would also have seen that *Hathaway* characterized the conviction as "a single count of forcibly assaulting a federal officer in violation of 18 U.S.C. § 111(a)." *Id*. at 1003. And they would have

---

[3] I admit to being taken aback that Jereb takes the same view. Appellant's Br. at 22. Jereb appears to believe that to prevail he must show that the error was plain at the time of trial. *Id*. ("At the time of Mr. Jereb's trial, the circuit authority was directly on point, and the statute was equally clear."). If so, then he is mistaken. New rules apply retroactively to cases pending on direct appeal. *Griffith*, 479 U.S. at 328. In any event, I disagree with the parties' view of *Hathaway* for the reasons given above. And I note that if *Hathaway* had required assault as an element of the other five acts, then the jury would have had to find this element beyond a reasonable doubt. *See Patterson v. New York*, 432 U.S. 197, 215 (1977) ("[*Mullaney v. Wilbur*, 421 U.S. 684 (1975),] surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense."). But I see nothing suggesting that the jury found this element, or any showing of overwhelming proof of the missing element. *Cf. United States v. Mann*, 786 F.3d 1244, 1251–52 (10th Cir. 2015).

5

seen that the court nowhere said that the five non-assault statutory methods of committing the crime required assault. Instead, they would have seen that the court simply went along with Mr. Hathaway's desire to retain his misdemeanor-assault conviction, once the court had concluded that the government had not proved felony assault. *See id.* at 1010. Finally, they would have seen that *Hathaway* neither mentioned nor explained language from the Supreme Court bearing on the possibility of a concomitant-assault requirement (further suggesting, to me, that *Hathaway* wasn't deciding that issue). In *United States v. Feola*, 420 U.S. 671, 682 n.17 (1975), the Court noted that 18 U.S.C. § 111 "outlawed more than assaults. It made it a criminal offense 'forcibly [to] resist, oppose, impede, intimidate, or interfere with' the named officials while in the performance of their duty."

In mentioning these points, I seek just to show that invited error is strong medicine to administer when Jereb (and the government and district court) could have reasonably believed—if ever contemplating it—that *Hathaway* did not require the government to prove concomitant assault as part of proving each of the five non-assault-specific statutory means of committing the crime.

I acknowledge that four months after Jereb's trial, the court in *Wolfname* culled from *Hathaway* an "implicit" holding that assault must be proved as part of any conviction under § 111(a)(1). 835 F.3d at 1218 (adding that "[t]rue, we didn't explicitly state in *Hathaway* that the government must prove assault when it alleges a defendant violated § 111(a)(1) by resisting, opposing, impeding, intimidating, or interfering with—rather than assaulting—an officer"). But for the reasons given, I believe that at the time

6

of Jereb's trial, *Hathaway* reasonably could have been read as being consistent with the long line of Tenth Circuit cases cited above, which affirmed § 111 convictions without jury findings of assault. In fact, *Hathaway* offers the government even less help than do those earlier cases; after all, the defendants in those cases, unlike Mr. Hathaway, were not advocating for an assault conviction.

So whatever the merits of *Wolfname*'s interpretation of *Hathaway*, I think the proper question is whether, in fairness, we can apply the invited-error doctrine here on grounds that *Hathaway* had obviously held that all § 111(a)(1) convictions require a jury finding of assault. In my view, transporting *Wolfname*'s interpretation of *Hathaway* back in time to Jereb's trial is unfair. Under pre-*Wolfname* law, the instructions given here were correct.[4] Invited error should not have a hair trigger activated by Jereb's failure to anticipate that *Wolfname* would find an implicit holding in *Hathaway* mandating an additional instruction requiring the government to prove assault as part of proving the five non-assaultive methods, including "opposing." I can't see how Jereb invited error by offering our approved pattern jury instruction on the elements of § 111(a)(1), (b).

---

[4] In fact, the § 111 instruction (found at section 2.09 of the Tenth Circuit Pattern Jury Instructions) has remained the same from its 2011 version through the 2017 amendments to the pattern instructions. Though the commentary to the pattern instruction discusses *Hathaway*—specifically, the holding that § 111 creates the three separate crimes—it does not mention any change by which the government has to prove assault as part of proving any of the means of violating the statute.

7

Second, I disagree with the majority that Jereb *induced* the district court to err.[5] *See* maj. op. at 24–25. The majority points to the instruction Jereb offered as well as the one given to the jury with his assent. As mentioned, Jereb wanted the instruction because it required jury unanimity for at least one of the methods of violating § 111(a)(1).[6] That was his sole focus. Jereb obviously overlooked the possibility that the statute required the government to prove assault as part of the five otherwise-non-assaultive methods of committing the crime (any such requirement is hardly obvious from reading § 111, and that poorly drafted statute requires considerable straining to read it sensibly to any conclusion). Common sense tells me that Jereb didn't intentionally relinquish that argument. After all, he had every reason to *add* elements, especially tough-to-prove ones like assault. So I see forfeiture, not waiver. *See Olano*, 507 U.S. at 733.

In concluding that Jereb invited the error he now complains of, the majority relies on *United States v. Cornelius*, 696 F.3d 1307 (10th Cir. 2012). *See* maj. op. at 23. And indeed *Cornelius* says that "[u]nder the invited error doctrine, this Court will not engage

---

[5] In my view, including inadvertent acts as inducements stretches "induce" beyond its meaning. *See* Oxford English Dictionary (online ed. 2018) (defining induce as "To lead (a person) by persuasion or some influence or motive that acts upon the will, *to* (*into*, *unto*) some action, condition, belief, etc.; to lead on, move, influence, prevail upon (any one) *to do something*."). I see nothing suggesting that Jereb induced the district court not to give a separate instruction requiring concomitant assault for each of the five other methods of committing the crime. No one contemplated that question. Again, the instructions given are correct (and remain in the current pattern jury instructions); they are just incomplete after *Wolfname* and *Kendall*.

[6] In fact, Jereb did better than he should have on this point. As later announced in *Kendall*, 876 F.3d at 1269, the six methods are not elements but instead are means. So Jereb was not entitled to jury unanimity on any particular one of the statutory methods.

8

in appellate review when a defendant has waived the right to challenge a jury instruction by affirmatively approving it at trial."[7] 696 F.3d at 1319. From this, the majority looks to the disputed jury instructions, and it notes that Jereb affirmatively approved them. Maj. op. at 17–20. But the problem with this view is evident when we compare Jereb's case to *Cornelius*. In *Cornelius*, the issue complained of on appeal was exactly the one that the defendant had expressly adopted in the district court—namely, that enterprise is not an element of a RICO conspiracy charge. 696 F.3d at 1319–21. Here, by contrast, Jereb never adopted the position that assault is *not* an element of the other five methods of violating § 111(a)(1).

The majority also relies on *United States v. LaHue*, 261 F.3d 993 (10th Cir. 2001). *See* maj. op. at 21-23. That case is similar to *Cornelius* in its differences from Jereb's case. In *LaHue*, as the majority recounts, defense counsel argued that the government had opened the door for them to mention in closing argument that the defendant-attorneys allegedly involved in the charged scheme had been acquitted. 261 F.3d at 1012. After the court agreed, defense counsel argued that the acquittals undermined the government's case against their clients. *Id*. After the jury convicted, though, defense counsel argued on

---

[7] Later opinions also written by Judge Ebel help explain the boundaries of *Cornelius*. In *United States v. Thornton*, 846 F.3d 1110, 1117 & n.3 (10th Cir. 2017), the court declined to find invited error where a defendant had challenged a prison sentence whose lengthier term was motivated by treatment available in prison—even though the defendant had argued in the district court that he would be less dangerous to the public because of available prison treatment. The court clarified the meaning of invited error: "Invited error occurs when the party sought out or 'affirmatively approv[ed]' an errant outcome." *Id*. at 1117 n.3 (alteration in original) (quoting *Cornelius*, 696 F.3d at 1319). The court called invited error a species of waiver "because it requires intentional relinquishment of a right." *Id.* at 1117 n.3 (citing *United States v. Rodebaugh*, 798 F.3d 1281, 1304 (10th Cir. 2015)).

appeal that the district court had erred by giving them what they wanted—specifically, they argued that by telling the jury about the defendant-attorneys' acquittal, the district court might have caused the jurors to wonder why the court had acquitted the attorneys but not the other defendants. *Id.* Unsurprisingly, we ruled that the invited-error doctrine applied in this circumstance. *Id.* at 1013. We found no prejudice, "because defendants' argument on appeal is a complete reversal from the position they sought to and did assert during closing argument." *Id.* This makes sense, because the defendants in *LaHue* had consciously decided to seek the very result they later complained about. By comparison, nothing suggests that Jereb induced the district court to commit the error of which he complains on appeal. Not foreseeing that the law would soon make the given instructions incomplete is a far different matter from spotting the incompleteness, seeking to take advantage of it in the district court, and when that didn't work out, reversing position on appeal.[8]

In my view, the majority has extended the invited-error doctrine beyond where we have previously applied it.[9] Until today, I see no cases imposing invited error on a

---

[8] One case that *Titties* relied on in its invited-error discussion is *Ray v. Unum Life Insurance Co.*, 314 F.3d 482 (10th Cir. 2002). *See Titties*, 852 F.3d at 1264 n.5. As do I, *Ray* considers it important to ask whether the party has switched to a directly contrary position on appeal. In *Ray*, "the parties had assumed in the district court that one legal standard applied, but the law changed after appellate briefing." *Id.* (citing *Ray*, 314 F.3d at 486). *Ray* says it well: "There is no evidence that on appeal Ray reverses a position she took at trial or that Ray induced the district court to apply an arbitrary and capricious standard; we do not see in the record even the slightest debate about which standard of review is appropriate." 314 F.3d at 486.

[9] The closest case to doing so that I see is *United States v. Sturm*, 673 F.3d 1274 (10th Cir. 2012). In that case, the district court instructed the jury on the defendant's

defendant who had proceeded in accordance with our cases and pattern jury instructions, even where cases decided afterward declare that approach erroneous. The majority's rule goes too far, especially when plain error is evident. Unlike the defendants in the majority's cited cases, Jereb did not argue a legal position to seek a favorable result in the district court and later reverse his position to seek an advantage on appeal. From the outset, Jereb would have been much better off had he spotted the issue he now advances.

---

theory of the case—using the instruction proposed by the defendant. *Id.* at 1280. Under the defendant's instruction, the court instructed the jury that "the mere act of observing child pornography, without possession or receipt, is not illegal." *Id.* On appeal, for the first time, Sturm contended that by not defining "receives," the instruction risked the jury's thinking that searching for and viewing child pornography on the computer was "receipt" (which it then wasn't). *Id.* In this circumstance, we concluded that the defendant had invited the error. But *Sturm* differs from Jereb's case. In *Sturm*, the issue of "receives" and "receipt" was apparent, not hidden in a jumbled statute like 18 U.S.C. § 111(a)(1). And the defendant chose to deal with this known issue by informing the jury that observing child pornography without possession or receipt is not illegal. *Id.* So, unlike Jereb, Sturm had surveyed the landscape and chosen his route.

11