RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-5295

CLIFFORD LEON HOUSTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:13-cr-00010-1—Danny C. Reeves, District Judge.

Argued: June 17, 2015

Decided and Filed: July 9, 2015

Before: SUTTON, GRIFFIN, and WHITE, Circuit Judges.

_____

### COUNSEL

_____

**ARGUED:** Mike Whalen, Knoxville, Tennessee, for Appellant. David C. Jennings, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Mike Whalen, Knoxville, Tennessee, for Appellant. David C. Jennings, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

### OPINION

_____

SUTTON, Circuit Judge. A grand jury indicted Clifford Leon Houston for transmitting a threat in interstate commerce. 18 U.S.C. § 875(c). When the case went to trial, the judge, applying then-governing Sixth Circuit precedent, instructed the jury that Houston's statement was a "true threat" if a "reasonable person hearing the statement would understand it as a serious

expression of intent to inflict injury." R. 294 at 28. The jury convicted Houston. The Supreme Court recently reversed a similar conviction under the same statute premised on a nearly identical jury instruction. *Elonis v. United States*, 135 S. Ct. 2001 (2015). What was appropriate for Elonis is appropriate for Houston. We reverse.

I.

Clifford Houston is not unacquainted with law enforcement or criminal defense lawyers. His most recent round of trouble began in 2006, when Houston participated in a shoot-out that ended with the death of a sheriff's deputy and his ride-along. Facing first-degree and felony murder charges, Houston obtained the services of an attorney, James F. Logan. To secure payment for Logan's representation, Houston's father executed a deed of trust on the family property, granting Logan an interest in the Houstons' land. The first trial ended in a mistrial, the second in an acquittal. Houston was not as grateful as one might expect. He did not pay his fees. That prompted Logan to foreclose on part of the Houston property, making the attorney and client neighbors and making the client unhappy.

It was not long before Houston was back in jail, this time awaiting trial on a firearms offense. While in jail, Houston heard that Logan had visited his family's property (now partly Logan's property), and did not take it well. As overheard by an official from the Blount County Sheriff's Office, Houston went into "a complete rage." R. 293 at 143. The official heard Houston say something about "killing them all." *Id.* at 142. Then, in a variation on Shakespeare's often-misinterpreted dictum, he said: "When me and my brother get out, we're going to go to that law firm and kill every last one of them." *Id.* at 143. The next day, Houston placed a phone call to his girlfriend, Pat Honeycutt. Here is part of what he said:

> HOUSTON: I'll kill that motherf[***]er [referring to Logan] when I get out. Hey, I ain't kidding! I ain't akidding! They can record it! They can do whatever the hell they want! That motherf[***]er opens up my house, I'll kill his ass! When I get out of this motherf[***]er, he's dead!
>
> . . .
>
> HOUSTON: The only thing [Logan]'s gonna get from me is a f[***]ing bullet! That's the only thing that son of a b[****] gonna get from me! That's the only damn thing! They better get somebody to lock that son of a b[****] up! 'Cause

I've got something for Mr. damn Logan! You let me get out of this motherf[***]er in any shape, form, or fashion, and he's got a damn problem!

. . .

HOUSTON: You tell any of my family, you tell Cody, you tell Rachel, any of them, to kill that son of a b[****]! . . . Any of my, any of my people has got my permission to kill that son of a b[****]!

HONEYCUTT: They ain't gonna do that. I mean, they ain't gonna shoot nobody.

HOUSTON: Well, I ain't got no damn problem with it. I ain't got no damn problem with it.

Trial Ex. 1.

A federal grand jury indicted Houston for making these threats. *See* 18 U.S.C. § 875(c). "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another," the statute says, "shall be fined under this title or imprisoned not more than five years, or both." *Id.* At his jury trial, the district court instructed the jury as follows about the meaning of a "threat": "A statement is a true threat if it was made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to inflict injury." R. 294 at 28. The jury found Houston guilty, and the court sentenced him to sixty months in prison.

II.

After Houston filed this appeal, the Supreme Court decided *Elonis v. United States*, 135 S. Ct. 2001 (2015). *Elonis* reversed a similar conviction under § 875(c) premised on a similar instruction. *Id.* at 2011–13. Here is what the *Elonis* instruction said: "A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual." *Id.* at 2007. In invalidating the instruction, the Court explained that "[f]ederal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state." *Id.* at 2012. Instead of permitting liability to turn on mere negligence—how acts "would be understood by a reasonable person"—criminal statutes presumptively require "*awareness* of some wrongdoing." *Id.* at 2011.

Houston claims that we should reverse his conviction because it was premised on a similar instruction.

The first order of business is to determine whether harmless-error review or plain-error review applies to this argument. Harmless-error review applies when the defendant preserves the objection at trial, and plain-error review applies when he does not. Fed. R. Crim. P. 52; *United States v. Olano*, 507 U.S. 725, 734 (1993). When the trial judge asked Houston whether he had any objections to the proposed jury instructions, Houston responded: "[The verdict form] says, 'On the charge of knowingly or willfully sending in interstate commerce a true threat to injure another, in violation of 875(c).' . . . [M]y point being is, the defendant didn't know that the communication left the state of Tennessee and went to Louisiana and then came back into the state." R. 294 at 4. All Houston was doing here, however, was objecting to the state of mind required with respect to the interstate-nexus instruction. He thought he could not be convicted unless he knew that his threat was transmitted in interstate commerce. Although we "liberally construe[]" pro se complaints and motions, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and although Houston was representing himself at trial (after being offered the services of court-appointed counsel), we cannot fairly read this statement as an objection to the trial judge's instruction on intent. Plain-error review applies.

Appellate courts have discretion to correct unobjected-to mistakes at trial if there is (1) an error (2) that is plain, (3) that "affected the [party's] substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009). Houston meets each requirement.

One: the instruction was erroneous. It permitted the jury to return a criminal conviction based on a negligent state of mind: "A statement is a true threat if it was made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to inflict injury." R. 294 at 28. That is precisely what *Elonis* proscribes. 135 S. Ct. at 2011. As the Court explained: "Such a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct—*awareness* of some wrongdoing.' Having liability turn on whether a 'reasonable person' regards the communication as a threat—regardless of what the defendant

thinks—'reduces culpability on the all-important element of the crime to negligence.'" *Id.* (citations omitted). And having liability turn on a "reasonable person" standard, we would add, permits criminal convictions premised on mistakes—mistaken assessments by a speaker about how others will react to his words. If a legislature wishes to criminalize negligent acts—and especially negligent utterances—it should say so explicitly; the criminalization of "threats" in "interstate commerce" does nothing of the sort.

Two: the error was plain. At the time of trial, it is true, our cases required a negligence instruction under this statute. *See United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012); *United States v. Alkhabaz*, 104 F.3d 1492, 1494–96 (6th Cir. 1997); *United States v. DeAndino*, 958 F.2d 146, 148–50 (6th Cir. 1992). But we gauge the obviousness of an error from the perspective of "the time of appellate consideration," not from the perspective of the time of trial. *Henderson v. United States*, 133 S. Ct. 1121, 1130–31 (2013). Under that test, the trial judge's error was plain, as *Elonis* demonstrates.

Three: the error affected substantial rights. There is a "reasonable probability" that the jury would have returned an acquittal had it been required to find a higher degree of intent, *see United States v. Marcus*, 560 U.S. 258, 262 (2010)—no matter whether recklessness by itself will suffice or whether some form of knowledge or purpose also is required, as the Court declined to decide in *Elonis*. 135 S. Ct. at 2012–13. Anyone listening to Houston's recorded diatribe (and we have had the pleasure) could plausibly think one of two ways about it. One possibility is that he meant just what he said, creating liability no matter what the standard is. The other possibility is that the recording caught him in a fit of rage in a prison cell (where he was in no position to act on his thoughts and where he did not necessarily know anyone other than his girlfriend was listening). That would be a fair, though not a necessary, interpretation. Recognizing that Houston was speaking with his girlfriend, a jury could reason that he was venting his frustration to a trusted confidante rather than issuing a public death threat to another. That Houston's girlfriend dismissed some of his comments out of hand ("[T]hey ain't gonna shoot nobody") would allow a jury to infer that he was ranting and raving rather than expressing an intent to cause harm. Houston was furious, to be sure, but he was not necessarily cogent— perhaps not even cogent enough to recognize the risk that his words would be perceived as a

threat, which is what even the recklessness standard would require. *See* Model Penal Code § 2.02(2)(c); *Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part). All in all, there was a "reasonable probability" that the verdict would have come out differently had the court instructed the jury correctly.

*United States v. Miller*, 767 F.3d 585 (6th Cir. 2014), reinforces this conclusion. There, too, the trial court mistakenly instructed the jury about the state of mind needed to convict the defendant. *Id.* at 589. There, too, the error became clear after trial due to intervening Supreme Court authority. *Id.* at 591–93. And there, too, we held that the error was not harmless. *Id.* at 594. In explaining our decision, we noted that "[m]otive was *the key issue* the defendants presented to the jury, and they presented enough evidence to support a finding in their favor on this score." *Id.* Because the instructional error related to "the state of mind of the defendants" and because that is invariably a "thorny issue," we concluded that the jury was best equipped to sort it out. *Id.* at 600; *see also Morissette v. United States*, 342 U.S. 246, 274–76 (1952); *United States v. Dudley*, 451 F.2d 1300, 1303 (6th Cir. 1971). A similar conclusion applies here.

Nor does it make a difference that *Miller* was a harmless-error case. The "substantial rights" inquiry is the same under the plain- and harmless-error tests (with the exception, not determinative here, that the burden of persuasion rests with the defendant in the plain-error context). *Olano*, 507 U.S. at 734. In this case, as in *Miller*, the instructional error relates to the paradigmatic jury question in a criminal proceeding: the defendant's state of mind. Confirming the point, the prosecutor in Houston's case devoted nearly three-quarters of his closing argument to trying to show that Houston's statements were real threats—that "a reasonable person who hears the communication [would] interpret it as serious." R. 294 at 11. The government's (understandable) emphasis on the negligence standard, together with the all-important nature of state-of-mind arguments in most criminal trials, tells us all we need to know about this error: An instruction premised on the correct standard reasonably could have led to a different verdict.

Four: the trial court's error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. As these open-ended terms suggest, this prong of the test is fact intensive and does not lend itself to clear rules. *See Johnson v. United States*, 520 U.S. 461, 470 (1997); *see also United States v. Cotton*, 535 U.S. 625, 633 (2002). Given the

importance of this instruction to Houston's case, the importance of state-of-mind instructions in "threat" cases in general, and the oddity of permitting a criminal conviction to stand based on a reasonable-person—which is to say, negligence—standard, we conclude that this conviction should be reversed. *See Olano*, 507 U.S. at 736; *United States v. Castano*, 543 F.3d 826, 833–37 (6th Cir. 2008). Houston deserves the opportunity to face a jury that has been properly instructed on a crucial element of the crime—indeed the most crucial element of this crime.

In *Elonis*, it bears adding, the defendant did not preserve a statutory challenge to the jury instructions at trial or before the Third Circuit. Only after the Supreme Court added the statutory-interpretation question to the case at the certiorari stage did Elonis address the issue and thereby obtain a foothold for reversing his conviction. *Elonis v. United States*, 134 S. Ct. 2819, 2819 (2014). Houston deserves the same opportunity.

The government resists this conclusion on the ground that recklessness satisfies the intent element of § 875(c) and that no reasonable jury could resist the conclusion that Houston was at the very least reckless. It is not that easy. Like the Supreme Court, we are a court of review, not first view. *Wood v. Milyard*, 132 S. Ct. 1826, 1834 (2012). The customary practice is to allow full briefing and argument on the issue at the trial level, after which we can assess whether the trial court in the first instance chose the correct standard (or if it wishes gave alternative standards for the jury to consider). All we have at this point are letter briefs and a complicated question of statutory interpretation. Nor would we be the first court to prefer discretion over valor in this setting. In *Elonis* itself, the recklessness question was not briefed before the Court; it was addressed only at oral argument. 135 S. Ct. at 2012–13. In that setting, the Court concluded: "We may be capable of deciding the recklessness issue, but following our usual practice of awaiting a decision below and hearing from the parties would help ensure that we decide it correctly." *Id.* at 2013 (internal quotation marks omitted). We take the same route here.

Even if recklessness turns out to be the correct standard, moreover, it is by no means obvious that a reasonable jury necessarily would convict. The question would be whether Houston "consciously disregard[ed]" the risks of his behavior or whether his consuming rage

prevented him from processing those risks.  Model Penal Code § 2.02(2)(c).  The answer is not open and shut.

*Neder v. United States*, 527 U.S. 1 (1999), adds nothing new to the inquiry.  It held that failure to instruct the jury on an element of the offense—materiality—was harmless error.  *Id.* at 15–20.  But appellate judges are better equipped to assess materiality than to evaluate states of mind based on a cold record.  The defendant in *Neder* "did not, and apparently could not, bring forth facts contesting the omitted element," *id.* at 19—something that is not true in this case, where the defendant has plenty to work with in contesting the mental-state determination.

## III.

That leaves one loose end.  Houston challenges the sufficiency of the evidence to support his conviction, a challenge we must address because a sufficiency-based reversal would preclude retrial under the Double Jeopardy Clause.  *Burks v. United States*, 437 U.S. 1, 18 (1978).  The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Before addressing this argument, a brief digression is in order.  Do we measure the sufficiency of the evidence to convict Houston under the wrong instruction (what was given) or the right one (what would otherwise be given on remand)?  Oddly enough, it is the wrong instruction, at least when the instructions omit or inaccurately describe an element of the offense and the defendant fails to object—as here.  Otherwise, we would be forced to measure the evidence introduced by the government against a standard it did not know it had to satisfy and potentially prevent it from ever introducing evidence on that element.  Nor does this approach create Double Jeopardy problems.  Consider this case:  If we think about the sufficiency of the evidence with respect to correct jury instructions, the government would not be seeking a second bite at the apple but a *first* bite under the right legal test.  That explains why *Lockhart v. Nelson*, 488 U.S. 33 (1988), likewise held that erroneously admitted evidence should be considered in evaluating a challenge to the sufficiency of the evidence.  *Id.* at 40–42.  "Permitting retrial in this instance," the Court reasoned, "is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed; rather, it serves the interest of the defendant by affording him an

opportunity to 'obtai[n] a fair readjudication of his guilt free from error.'" *Id.* at 42 (quoting *Burks*, 437 U.S. at 15). Other appellate courts have reached the same conclusion. *See United States v. Gonzalez*, 93 F.3d 311, 323 (7th Cir. 1996); *United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1995); *United States v. Weems*, 49 F.3d 528, 530–31 (9th Cir. 1995); *United States v. Inman*, 558 F.3d 742, 748 (8th Cir. 2009) (dicta); *cf. United States v. Musacchio*, 590 F. App'x 359, 362–63 (5th Cir. 2014) (per curiam), *cert. granted*, No. 14-1095 (U.S. 2015) (addressing whether an erroneous jury instruction becomes law of the case when the government fails to object).

Houston argues that there was insufficient evidence that his statements qualified as a threat. As noted, the jury instructions defined a threat as a statement "made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to inflict injury." R. 294 at 28. A reasonable jury could find that Houston's statements met this standard given his harsh language, aggressive tone, and graphic descriptions of his desire to harm Logan. Houston adds that there was insufficient evidence that his threat traveled in interstate commerce, because he dialed his girlfriend (who had a Tennessee number) from a Tennessee jail. But the government presented evidence that calls from the Blount County Jail (where Houston was located) are routed through a server in Louisiana. A reasonable jury thus could conclude that Houston's threat traveled in interstate commerce.

For these reasons, we reverse Houston's conviction and remand the case for further proceedings.