**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ALEJANDRO ARCINIEGA-ZETIN,

    Defendant - Appellant.

No. 16-4145
(D.C. No. 2:14-CR-00154-DN-EJF-8)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

A Utah jury found Alejandro Arciniega-Zetin (Arciniega) guilty of distributing

heroin and, alternatively, of aiding and abetting the distribution of heroin. He appeals

on two grounds. First, he contends that the district court erroneously instructed the

jury on the law governing constructive possession, distribution, and aiding and

abetting and that it should not have given a deliberate-ignorance instruction. He

failed to preserve these issues by timely objecting in the district court, so he now

argues for plain error. But the government argues that plain-error review is

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

unavailable because Arciniega invited the erroneous instructions. Alternatively, the government argues that even if he were allowed to try, Arciniega could not show plain error. Second, Arciniega argues that his conviction lacks sufficient supporting evidence. We agree with the government that Arciniega's arguments lack merit, so we affirm.

## BACKGROUND

In October 2011, the FBI joined the Salt Lake City police department in investigating a major drug-trafficking ring operating in the area. Law enforcement had learned of drug activity occurring in the locked, upstairs room of a local auto-body shop. Between July 2012 and early 2013, agents placed two pole cameras at locations near the shop to monitor activity outside it. During this time, agents also obtained a federal warrant to install hidden cameras in the shop's lobby. On April 25, 2013, agents obtained another federal warrant, this time to install a hidden camera and microphone in the upstairs room.

From May 1, 2013 until June 29, 2013, the FBI monitored all happenings in that upstairs room. It also continued to monitor activity in the lobby of the shop and outside the shop. From this surveillance, agents knew that Samuel Covarrubias-Velazquez (Covarrubias) controlled access to the shop's locked, upstairs room. They repeatedly saw him unpackage, weigh, and buy bulk quantities of methamphetamine and heroin and then, without leaving the room, store the narcotics above the ceiling of a utility closet. In addition, they saw him routinely remove the narcotics from that location and break down the bulk amounts into smaller amounts for redistribution.

2

On June 1 and 8, 2013, agents surreptitiously entered the locked room to inspect, weigh, and take samples of the suspected heroin and methamphetamine. On June 1, agents found two packages, one containing 105 grams of heroin, the other, 97.5 grams of heroin. On June 8, they found two packages of methamphetamine, the first containing 452 grams, the other, 917.5 grams. They also found a shoebox that held two packages of heroin, the first of which weighed 1,017.5 grams, the second, 757 grams.[1]

On June 13, 2013, at about 10 p.m., Detective Kevin Ford, then working for the Salt Lake City police department, was monitoring the pole-camera feed when he saw two cars pull up to the auto shop. Covarrubias drove the first car, and Arciniega drove the second. Detective Ford saw Carlos Tenengueno emerge from the back seat of the Arciniega-driven car. Covarrubias got out of his car carrying a small object. Though both Covarrubias and Tenengueno were known from the investigation, Arciniega was not.

The three men went into the shop's main office on their way upstairs to the locked room.[2] Once upstairs, Covarrubias sat on a couch and unwrapped and weighed a "burrito-shaped" package containing more than 100 grams of heroin. After placing

---

[1] The agents took the seized samples to the laboratory, where technicians tested the samples and identified them as methamphetamine and heroin.

[2] The jury viewed the entire video of the three men in the room, including the sixteen minutes they took counting, recounting, and bundling the cash, and heard them joke and laugh together throughout the encounter. 158 (3:12 to 19:06, 4:18-22, 10:46-52, 13:34-36)

the object into a container, Covarrubias handed Arciniega and Tenengueno a large amount of cash.

The three men then counted and recounted the money. Covarrubias was apparently about $250 short. This led both Covarrubias and Tenengueno to make telephone calls. During his call, Tenengueno mentioned that he and Arciniega were in the room. In addition, an FBI language analyst testified about Arciniega's having placed a telephone call while in the room, too. As seen from the transcript provided to the jury, Arciniega told an unidentified person, "Man, I'm here counting it" and twice referred to something being "weigh[ed]" and something "cut" "in three." Suppl. R. vol. 1 at 2.

Soon after this, Covarrubias appeared to furnish the needed money. During this time, the three men remained friendly, even laughing together. The three men bundled three stacks of cash, and Arciniega put the bundles in a bag. Covarrubias then stored the purchased heroin in the ceiling. The three men left the room and the auto shop. Detective Ford, who was watching events unfold on a pole-camera feed, then saw a fourth man for the first time. Detective Ford testified that this man had likely emerged from the front passenger seat of the Arciniega car when it pulled up, and then served as a lookout during the drug transaction. This man and Arciniega drove away together.

Rather than accompanying Arciniega, Tenengueno departed as a passenger in a Hummer that had parked near the shop as the men were leaving. Before the Hummer pulled away, Tenengueno placed the bagged, bundled money in the back-seat area.

4

All told, the three men had spent about eighteen minutes in the upstairs room. No evidence showed that Arciniega had ever touched the package of heroin.

After the Hummer left, the agents arranged for a local officer to follow and stop it as soon as it committed a traffic violation. The Salt Lake City police officer who did so soon learned that the driver, Jose Munoz, had a suspended driver's license and that the Hummer was not properly licensed. The officer impounded the Hummer and, while inventorying its contents, recovered the bag, with $20,000 cash inside, from behind the front seat. The cash was bundled into two stacks of $7,000 and one of $6,000.

On June 27, 2013, officers surreptitiously entered the upstairs room a third time, this time finding three packages—the first contained 450 grams of heroin, the second, 1,035 grams of suspected heroin, and the third, 76.5 grams of suspected heroin.[3] In addition, they found three bags, each containing about a pound of suspected methamphetamine, and a fourth bag with 88.5 grams of methamphetamine.

Though the warrant authorizing the closed-circuit-television feed from the camera located in the upstairs room expired on June 29, 2013, the investigators continued to monitor the video feed from the pole cameras and the shop-lobby camera. R. vol. 3 at 247:11.

---

[3] The officers could not take samples from two bags because of how they were packaged. The suspected heroin was so tightly wrapped that if the officers had tried to take a sample then and there, they would have "alert[ed] the individuals involved." R. vol. 3 at 235:21.

From these cameras, on September 13, 2013 at about 8:43 p.m., officers saw Arciniega arrive at the shop, driving a car that Tenengueno had previously used. Once there, Arciniega retrieved a backpack from the car's trunk and entered the shop. Covarrubias met him, and the two men appeared to go upstairs. Arciniega later left the shop and put the backpack inside the car.

On September 21, 2013 at about 3:50 p.m., Arciniega arrived at the shop, driving the same car he had the week before. Again, Arciniega retrieved a bag from the car's trunk, and again, he met Covarrubias. The men once more appeared to go to the upstairs room. This time, though, Arciniega left the shop empty handed.

FBI Special Agent Jason Kennedy, the primary case agent, would later testify at Arciniega's trial that he believed Arciniega had delivered narcotics to the shop during these two September visits. Though Agent Kennedy had spent ten to twenty hours a day for many days monitoring the activity in the shop's upstairs room, he saw only drug activity, never legitimate business activity. He testified that he saw people arrive at the shop to deliver suspected narcotics "all the way until April 2nd of 2014." R. vol. 3 at 254:5–6. That day, law-enforcement officers executed a search warrant at the shop's locked, upstairs room, seizing about 2.5 kilograms of heroin.

At Arciniega's trial, Covarrubias testified that he had already pleaded guilty to various crimes, including conspiring to distribute heroin at the shop in May and June 2013. He described how he had used the shop's upstairs room to buy, repackage, and redistribute methamphetamine and heroin, including the heroin that he bought for $20,000 on the night of June 13, 2013.

6

Though Arciniega wanted to call Tenengueno as a witness, Tenengueno refused to testify. Instead of live testimony, the parties agreed to read to the jury a stipulation of what Tenengueno's testimony would have been, namely, that Tenengueno distributed the heroin to Covarrubias on July 13, 2013; that Arciniega drove Tenengueno to the auto-body shop at about 10 p.m. that night; that Arciniega didn't know that Tenengueno was going to the shop to complete a narcotics transaction; and that Arciniega became aware of the narcotics transaction while in the upstairs room.

The jury found Arciniega guilty of distributing heroin. He now appeals his conviction.

## DISCUSSION

Arciniega asserts that the district court committed two reversible errors: (1) that it improperly instructed the jury and (2) that it refused to dismiss the heroin-distribution charge for insufficient evidence at the close of the government's case-in-chief. We address each alleged error in turn.

A.  **Arciniega's Claims of Instructional Error**

Though Arciniega acknowledges that he never objected to any jury instructions in the district court, he argues on appeal that the district court erred by incorrectly instructing the jury on the law governing constructive possession, distribution, and aiding and abetting and by giving a deliberate-ignorance instruction. Arciniega contends that we

7

should review these claims under the plain-error standard. But we agree with the government that Arciniega invited any error, precluding his requested plain-error review.[4]

In *United States v. Jereb*, this court applied the invited-error doctrine to preclude Mr. Jereb's claim of instructional error. 882 F.3d 1325, 1341 (10th Cir. 2018). Despite never having objected in the district court, Mr. Jereb contended on appeal that the district court had erred by not instructing the jury that assault is an element of each means of violating 18 U.S.C. § 111.[5] *Id.* at 1334. But his position on appeal "directly contradict[ed]" what he had argued in the district court—that "[i]f the jury could convict upon a unanimous finding of one of the other means of violating the statute, it necessarily need not find assault in every case." *Id.* at 1341; *see also id.* at 1335–38 (summarizing the parties' exchange with the district court about the § 111 instruction). In this circumstance, this court ruled that Mr. Jereb had induced the error he complained of on appeal. *Id.* at 1341. As we noted, a party cannot induce the district court to rely on an erroneous

---

[4] We would still affirm if we applied the plain-error standard. The evidence leaves us confident that any instructional error did not "affect[] the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). In short, we would conclude that Arciniega hasn't met his burden to show a reasonable probability that absent instructional error, the case would have had a different outcome. Arciniega's showing is insufficient to undermine our confidence in the jury's finding that he *aided and abetted* the heroin distribution. *See United States v. Benford*, 875 F.3d 1007, 1017 (10th Cir. 2017).

[5] Those means are "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with any person designated in section 1114 of this title [federal officers and employees] while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1).

proposition of law and then later complain of the error on appeal. *See id.* at 1338 (quoting *United States v. Morrison*, 771 F.3d 687, 694 (10th Cir. 2014)).

Here, Arciniega jointly proposed the instructions he now complains about. During the final-pretrial conference two business days before trial, the district court asked counsel about the court's recently sent package of preliminary instructions. Both parties told the court that they approved those instructions. Next, the court asked whether the parties would be jointly submitting voir dire questions. In response, Arciniega's attorney told the court that the voir dire questions were "labeled government" but that the prosecutor and he had "last week worked out almost all the issues on instructions and the voir dire, so those would be jointly proposed." R. vol. 3 at 11:19–22.

On appeal, Arciniega contends that his counsel was jointly proposing only the preliminary instructions. This would make no sense. After all, the parties had already agreed to use the court's package of preliminary instructions. Later in the pretrial conference, Arciniega's attorney returned to the subject of the jointly requested instructions, telling the court about two preliminary instructions he wanted to be included "in the government's, in our joint request." R. vol. 3 at 26:20–21. Nothing in the record shows the district court and counsel later even mentioning the now-challenged jury instructions. We conclude from all this that the "jointly proposed" instructions—as described by Arciniega's counsel—included each of the instructions that Arciniega now challenges.

"Under the invited error doctrine, this Court will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively

approving it at trial." *Jereb*, 882 F.3d at 1335 (quoting *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012)). When a party proposes a jury instruction, "any error [in that instruction] was 'invited' . . . and cannot form the basis for reversal." *United States v. Hunter*, 739 F.3d 492, 494 (10th Cir. 2013).

The invited-error doctrine doesn't apply when a party simply "provided the district court 'settled circuit law,' only for that settled law to be upended at some later date." *Jereb*, 882 F.3d at 1335. But here, Arciniega cannot show a post-trial change in settled circuit law affecting any of his four assertions of instructional error.

Indeed, for three of the allegedly erroneous instructions—on distribution, deliberate ignorance, and aiding and abetting—Arciniega doesn't even argue that the law changed in the time between his conviction and our deciding this case. That leaves Arciniega having jointly proposed these challenged instructions on points of law unaffected by any supervening authority (yet allegedly out of step with existing authority)—a path that the invited-error doctrine blocks.

For the challenged instruction on constructive possession, Arciniega at least argues that the settled circuit law changed after his trial. He notes that in July 2016, four months after his trial, this court decided *United States v. Little*, which, he says, changed our circuit's constructive-possession law to fit a recent United States Supreme Court decision. 829 F.3d 1177, 1182 (10th Cir. 2016) (citing *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015)). *Little* held that constructive possession contains as an element that a defendant not only have power to exercise dominion and control over an object, but

10

also the intent to do so.[6] *Id.* Until then, our leading circuit authority on this point, *United States v. Colonna*, had rejected any requirement that the government prove intent to exercise dominion or control over an object. 360 F.3d 1169, 1178–79 (10th Cir. 2004), *abrogated by Henderson*, 135 S. Ct. at 1784.

Even so, we conclude that Arciniega also invited the erroneous instruction on constructive possession. A year before his trial, the Supreme Court ruled in *Henderson* that "[c]onstructive possession is established when a person, though lacking such physical custody [actual control], still has the power and intent to exercise control over the object." 135 S. Ct. at 1784. In *Little*, we "agree[d] that *Henderson* change[d] the law of constructive possession in our circuit." 829 F.3d at 1182. We declared that "*Colonna*'s disavowal of an intent requirement is incompatible with the Supreme Court's decision in *Henderson* . . . ." *Id.* So *Henderson* set the controlling rule in our circuit *before* Arciniega jointly proposed the inconsistent constructive-possession instruction. And when he induced the district court to accept the parties' constructive-possession instruction, Arciniega failed to avail himself of the intent-to-control element that *Henderson* had created. *See United States v. Martinez*, No. 16-1393, 2018 WL 4334098, at *5 (10th Cir.

---

[6] In *United States v. Simpson*, 845 F.3d 1039, 1060 (10th Cir. 2017), we suggested that *Little* was the case that changed our circuit's law on constructive possession by adding the intent-to-control element. For two reasons, we decline to follow that suggestion. First, as noted above, *Little* itself says that *Henderson* changed the rule in our circuit to add this element. Second, *Simpson*'s view on this point is dicta because both *Henderson* and *Little* postdated Mr. Simpson's verdict. *See Little*, 845 F.3d at 1060. And we are not bound by this dicta from *Simpson*. *See Bates v. Dep't of Corr.*, 81 F.3d 1008, 1011 (10th Cir. 1996) ("[A] panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's *dicta*.").

11

Sept. 11, 2018) (recognizing that our circuit's law on constructive possession had changed not with *Little* but instead a year earlier with *Henderson*). Accordingly, Arciniega cannot avoid invited error on this instruction, either.

In sum, the invited-error doctrine bars appellate review of all four of Arciniega's jury-instruction challenges.

## B. Sufficiency of the Evidence

Arciniega next contends that the evidence at trial was insufficient to sustain his conviction for distributing heroin and for aiding and abetting its distribution.

In evaluating the sufficiency of evidence, we review the record in the government's favor and ask whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir. 1993). In doing so, we give the government the benefit of all reasonable inferences from the evidence, direct and circumstantial. *Id.* "[W]e accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." *United States v. Dirden*, 38 F.3d 1131, 1142 (10th Cir. 1994).

Before resolving Arciniega's unusual sufficiency-of-evidence claim, it helps to pause and get our bearings. As an overview, we consider three circumstances in which defendants might raise the sufficiency-of-evidence issue.

First, and ordinarily, the district court has correctly instructed the jury on the law and no supervening authority has arisen since. There, reviewing the evidence's sufficiency is straightforward: We compare the elements with the evidence, and the evidence suffices if a reasonable jury could convict.

12

Second, sometimes the district court has correctly instructed the jury on the existing law, but a supervening authority has changed the law after trial. If the defendant did not contemporaneously object to the instruction, we must review the instruction for plain error. The defendant will likely win on at least the first two prongs of plain error, and if he also shows the third and fourth prongs, then he is entitled to a new trial. By bringing a sufficiency-of-the-evidence challenge, though, the defendant can do even better than that—he can win outright. We must order the dismissal of any charge that the government failed to prove by sufficient evidence under the law in force during his trial. But if the government's proof suffices under that now-outdated law, then showing that this proof would *not* suffice under the supervening law won't win the defendant a dismissal. *See Benford*, 875 F.3d at 1014–15 ("We analyze the sufficiency of the evidence under the law in effect at the time of trial."); *see also United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1995) ("[T]he government . . . cannot be held responsible for 'failing to muster' evidence sufficient to satisfy a standard which did not exist at the time of trial."). The Sixth Circuit favors measuring sufficiency under the law in force at trial, regardless of intervening changes, in part "because a sufficiency-based reversal would preclude retrial under the Double Jeopardy Clause." *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015); *accord Benford*, 875 F.3d at 1015 (citing *Houston*).

Third, are cases like this one, in which the district court has incorrectly instructed the jury on the law, but only after the defendant induced it to err by proposing the erroneous instruction. In that circumstance, the defendant has invited the error, and plain-error review is unavailable for the erroneous instruction. But when we measure the

13

sufficiency of the evidence, do we apply the law as instructed, or the governing law in the circuit at the time of the trial? If we measure the evidence by the law as instructed, we may deprive the jury of the opportunity to properly decide the case. If instead we measure the evidence by the law that the defendant induced the district court to overlook, then he may remain in prison even though the government couldn't have proved all the elements of the crime. But that may be the price for the defendant's inviting error.

We decline to decide the issue today, because we would affirm Arciniega's conviction under either the governing or instructed law,[7] and because we don't have the benefit of the parties' briefing on the issue. This means that for this case, despite Arciniega's invited error, we will give him the benefit of the supposedly favorable law governing aiding and abetting that he neglected to include in the jointly proposed instructions.

---

[7] We would affirm the aiding-and-abetting conviction under either the law in place at the time of trial or the law as instructed. But we agree with Arciniega that we could not affirm his heroin-distribution conviction under the government's theory that he constructively possessed the heroin as *Henderson* and *Little* define constructive possession. The record contains no evidence that Arciniega ever touched the heroin. The best the government can do is to say that Tenengueno and Arciniega provided the heroin to Covarrubias at a different location. That isn't good enough. The record shows that Arciniega aided and abetted the heroin transaction as Tenengueno's subordinate, but all evidence points to Tenengueno and Covarrubias as the main parties to the deal. Quite simply, Arciniega would have had no reason to actually possess the heroin, so we cannot say that the evidence suffices to show that he intended to do so.

14

Arciniega contests only the aiding-and-abetting instruction's failure to require proof of "advance knowledge" of the heroin-distribution crime. So he acknowledges that the government's proof satisfied the instruction given:

> [Y]ou may find a defendant guilty of the offense charged if you find beyond a reasonable doubt that the government has proved that another person actually committed the offense with which the defendant is charged, and that the defendant aided or abetted that person in the commission of the offense.
>     . . . .
> In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associated himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed.
>     . . . .
> The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. Presence or association is, however, a factor that you may consider along with other evidence in reaching your verdict. An aider and abetter must have some interest in the criminal venture.

R. vol. 1 at 152–53.

To support Arciniega's argument that this instruction is legally incomplete—that it fails to include as an element that he had advance knowledge of the entire crime—he relies on *Rosemond v. United States*, a case decided well before Arciniega induced the court to instruct the jury as it did. *See* 572 U.S. 65, 69 (2014). In relying on *Rosemond*, Arciniega likens his legal situation to that of Justus Rosemond. To evaluate the merits of that view, we must take a close look at *Rosemond*.

In the Court's words, *Rosemond* arose "from a drug deal gone bad." *Id.* at 67. A woman agreed to sell a pound of marijuana to two other men, and she took two men with her to the sale, one of whom being Mr. Rosemond. *Id.* After the buyers assaulted one of

15

the seller's male compatriots and ran with the marijuana, one of the male compatriots "exited the car and fired several shots from a semiautomatic handgun." *Id.* The woman gave chase in her car, but that ended when an officer stopped her car in response to a dispatcher's alert. *Id.* at 67–68.

Because the government was uncertain which of the two men had fired the gun, prosecutors charged Mr. Rosemond with violating 18 U.S.C. § 924(c) and aiding and abetting that offense under 18 U.S.C. § 2. *Id.* at 68. The government's primary theory was that Mr. Rosemond had fired the gun. *Id.* As in Arciniega's case, the district court instructed the jury that to aid and abet, a defendant "must 'willfully and knowingly associate[] himself in some way with the crime, and . . . seek[] by some act to help make the crime succeed.'" *Id.* (alterations in original). But the district court refused Mr. Rosemond's proposed instruction, which required that he could be "found guilty of aiding or abetting a § 924(c) violation only if he 'intentionally took some action to facilitate or encourage the use of the firearm,' as opposed to the predicate drug offense." *Id.* at 69. The district court opted for an instruction "telling the jury that it could convict if '(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime.'" *Id.*

The Supreme Court reviewed the common-law standards for accomplice liability, citing its cases holding that under 18 U.S.C. § 2 "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Id.* at 71 (quoting *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181 (1994)). The Court noted that "[a]s at common law, a person

16

is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* (citing 2 Wayne R. LaFave et al., *Substantive Criminal Law* § 13.2 at 337 (2003)).

The Court then turned to how "those two requirements—affirmative act and intent—apply in a prosecution for aiding and abetting a § 924(c) offense." *Id.* In particular, the Court referenced the "compound nature" of that "double-barreled crime"— "'us[ing] or carr[ying] a firearm' when engaged in a 'crime of violence or drug trafficking crime.'" *Id.* (alterations in original). For this "combination crime," the Court concluded that "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." *Id.* at 75, 77. Then "the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one." *Id.* at 77–78. This requires that the § 924(c) defendant have "advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice." *Id.* at 78. Deciding to go ahead with the venture with this knowledge "shows his intent to aid an *armed* offense." *Id.*

From this, Arciniega argues that the aiding-and-abetting instruction for drug distribution (in *Rosemond*-style terminology, a single-barreled crime) must also require advance knowledge of the entire crime. In *Rosemond*, the Court did not apply its advance-knowledge requirement to the first part of the § 924(c) offense—that is, the drug-trafficking crime. In other words, the Court did not require proof that Rosemond

17

knew he was heading to a drug deal when he got into the car. But Arciniega argues we must do just that for his crime of aiding and abetting heroin distribution. We agree that Arciniega needed to know before the heroin sale was completed that he was aiding and abetting this offense. But we have no difficulty concluding that a reasonable jury could find that he did know that. In short, a reasonable jury could have found that Arciniega knew he was assisting a drug transaction each step of that night's journey. Though Arciniega says he did not even know a drug deal was going to happen in the upstairs locked room, a reasonable jury could certainly decide otherwise.

First, the jury could consider the events leading up to the three men's arrival at the shop. Covarrubias arrived first, and Arciniega immediately pulled in behind. Tenengueno got out of the back seat, and Arciniega got out of the driver's-side door. Covarrubias appeared to be holding an object later believed to the heroin. The three men went directly upstairs into the locked room and immediately began consummating the heroin purchase. To complete the purchase, $20,000 changed hands—hardly the sort of event seasoned drug dealers would invite an innocent stranger to attend.

Second, the jury could consider the events inside the room from observing and listening to the recordings that the government introduced. The jury saw Arciniega fully engaged, counting cash, at ease and without hesitation. Arciniega contributed to completing the offense. Absent the money being counted and recounted and bundled and packaged (all roles he welcomed while acting friendly and jovial with Tenengueno and Covarrubias), the drug deal couldn't have occurred.

18

Third, the jury could consider the events after the men left the shop. A fourth man had remained in the Arciniega car, and the jury heard testimony that he had likely acted as a lookout. If Arciniega were ignorant of any imminent drug deal, he could have remained in the car, but he did not. In addition, Arciniega registered no surprise during the $20,000 heroin sale or when, even though he had driven Tenengueno to the drug deal immediately behind Covarrubias's car, Tenengueno left in a different automobile, the red Hummer driven by Munoz.

Fourth, the jury heard evidence about Arciniega's two September 2013 trips to the shop, during which he carried a backpack and a bag to meet with Covarrubias. The jury could reasonably conclude that Arciniega was continuing to involve himself in the same drug-distribution activity. And in seeing that he was doing so, the jury could reasonably believe that he was not a mistaken stranger to the June 13, 2013 drug transaction. This evidence amply proved Arciniega's aiding and abetting the drug offense, from start to finish.

Thus, even if Arciniega could challenge the sufficiency of the evidence on *Rosemond* grounds, despite inducing the district court to give an instruction without an advance-knowledge element, and even if *Rosemond*'s advance-knowledge requirement applied to single-barreled crimes like drug distribution,[8] we conclude

---

[8] Neither the Supreme Court nor this circuit court has extended *Rosemond* beyond the combination crime of 18 U.S.C. § 924(c). That alone would have defeated any plain-error argument based on *Rosemond* even had Arciniega not invited the error.

that a reasonable jury could find that Arciniega's actions and words showed that he did indeed have advance knowledge that he was aiding and abetting a drug distribution.

We therefore reject Arciniega's challenge to the evidence's sufficiency.

## CONCLUSION

For these reasons, we affirm.

Entered for the Court


Gregory A. Phillips
Circuit Judge