NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0236n.06

No. 20-5752

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MATTHEW C. BUTLER,

    Plaintiff-Appellant,

        v.

FERGUSON ENTERPRISES, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

FILED
May 10, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

---

BEFORE: BATCHELDER, GRIFFIN, and BUSH, Circuit Judges.

GRIFFIN, Circuit Judge.

Matthew Butler sold his hardware company to Ferguson Enterprises, Inc. Under the terms of the sale, Ferguson agreed to pay Butler an annual multimillion-dollar bonus if the company hit certain profit targets. After the company missed one of these targets, Butler sued Ferguson, alleging that it had sabotaged the company's profitability to avoid paying him the bonus. The district court dismissed Butler's case, finding that his breach-of-contract and indemnification claims were implausible. But because Butler's allegations raise reasonable inferences that support his claims, we reverse and remand.

I.

Butler and his father founded Clawfoot Supply, LLC, d/b/a Signature Hardware ("Signature") in 2001. Over the next fifteen years, Signature prospered as an online seller of fixtures and hardware for bathrooms and kitchens. Signature's success came primarily from its

"e-commerce sales of new and unique products," which the company purchased from overseas manufacturers. "Given the manufacturers' size and location, most manufacturers required [Signature] to place large orders to lower shipping costs." These large orders meant that Signature stored its inventory "for an extended period of time." On average, two years passed between the time that Signature identified the products it would purchase and the time that it ultimately sold those products to its customers. Another key to Signature's success was its employee-incentive program; to motivate its workers, Signature tied their bonuses to its profitability.

In 2016, Butler and his father sold all of the membership interests in Signature to Ferguson for roughly $210 million. After the sale, Butler remained Signature's chief executive. On top of the purchase price, the membership interest purchase agreement ("MIPA") provided that Butler would receive "contingent purchase price" payments (commonly called "earn-out payments," referred to here as "CPP payments") of between $3.3 million and $6.7 million if Signature's trading profit hit certain annual targets. For example, if Signature's 2018 trading profit was greater than or equal to $31,740,538, Butler would receive $3.3 million plus 83.3% "of the amount by which [the] 2018 Trading Profit [was] greater than the 2018 Threshold" until he hit a cap of $6.7 million. The MIPA required Ferguson to calculate Signature's trading profit according to international financial reporting standards ("IFRS").

Although the MIPA provided that Ferguson would have "sole discretion with regard to all matters relating to the operation of [Signature]," this discretion had one important limit: Ferguson was prohibited from "directly or indirectly, tak[ing] any actions with the intent of avoiding or reducing the amount of the [CPP payments.]" The MIPA also provided an indemnification procedure wherein a party's claim against the other would be deemed accepted if it was not responded to within 15 days.

As the new owner, Ferguson made some changes to the company that, according to Butler, reduced Signature's trading profit. For example, Ferguson implemented a new accounting rule that expensed all inventory held for more than a year as "slow moving." Given Signature's practice of warehousing its products for an extended period of time, this so-called "12-Month Rule" created a significant new expense that, at least on paper, drove down the company's profits. After Butler expressed concern about the 12-Month Rule's impact on Signature, Ferguson promised to repeal it (which was permitted under Ferguson's accounting rules for its subsidiaries) and credit roughly $1 million to Signature's trading profit calculation. Ferguson did not fulfill either of these promises. Ferguson also detethered Signature's bonus policy from the company's profitability. From then on, Signature employees would receive a bonus regardless of how well their employer performed.

Despite these changes, Signature's 2017 trading profit was high enough to qualify Butler for the maximum $6.7 million CPP payment. The next year, however, Ferguson's calculation showed that Signature's trading profit fell $1,106,341 short of the relevant threshold, disqualifying Butler from even the minimum $3.3 million payment. Butler objected to Ferguson's calculation. Ferguson received Butler's objection but did not respond.

Butler then sued Ferguson, alleging that it had breached the MIPA by acting with the intent to reduce or avoid his 2018 CPP payment and had conceded liability for an earn-out payment under the indemnification clause by not responding to his objection. Ferguson moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Butler's claims were implausible. The district court granted the motion, concluding that "it does not make economic sense for [Ferguson] to purchase Signature for 210 million dollars and make the full 2017 CPP payment, but also put in place large, structural policy changes, which would significantly reduce Signature's growth and

profit over a long period of time, simply to avoid making the relatively small 2018 CPP payment."

Butler then filed this timely appeal.

## II.

This court reviews de novo a district court's dismissal of a complaint under Rule 12(b)(6). *Giasson Aerospace Sci., Inc. v. RCO Eng'g Inc.*, 872 F.3d 336, 338 (6th Cir. 2017). We accept the truth of Butler's well-pleaded factual allegations and will "affirm the district court's grant of the motion only if the moving party is entitled to judgment as a matter of law." *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). We must construe the complaint in the light most favorable to Butler and draw all reasonable inferences in his favor. *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

## III.

### A.

Before we turn to the plausibility of Butler's allegations, we note a disagreement between the parties about the definition of intent. Again, the MIPA prohibits Ferguson from "directly or indirectly, tak[ing] any actions with the intent of avoiding or reducing the amount of the [CPP payment.]" Ferguson argues for (and the district court applied) an interpretation of this provision derived from *Lazard Tech. Partners, LLC, v. Qinetiq N. Am. Operations, LLC*, 114 A.3d 193 (Del. 2015). In *Lazard*, the Delaware Supreme Court interpreted an almost identical earn-out provision

and found that, "[b]y its unambiguous terms, that term only limited the buyer from taking action intended to reduce or limit an earn-out payment." *Id*. at 195. Applying the "well-understood concept" of intent, the court held that this meant that the provision "barred the buyer from taking action *specifically motivated* by a desire to avoid the earn-out." *Id*. (emphasis added). It further concluded that "avoiding the earn-out" did not need to be the buyer's "sole intent" but "that the buyer's action had to be motivated at least in part by that intention." *Id.* Under the *Lazard* approach to intent then, only actions specifically motivated, at least in part, by Ferguson's desire to reduce or avoid the CPP payment can constitute a breach of the MIPA.

Butler resists application of *Lazard*, arguing that its approach to intent is at odds with Kentucky law. Butler instead asks this court to apply a broader, tort-based definition of "intent" wherein that word "denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965). For a breach of the MIPA to occur under this definition, Ferguson's actions need not have been specifically motivated by a desire to avoid or reduce Butler's earn-out; Ferguson would only have had to know that an avoidance or reduction of Butler's earn-out was substantially certain to result from its actions.

We need not resolve this dispute, however, because Butler has plausibly alleged that Ferguson acted with the necessary intent even under the narrower definition advocated for by Ferguson.

B.

A fuller understanding of the CPP provision and its 2018 terms is necessary to demonstrate why the district court improperly dismissed Butler's complaint. In 2018, the CPP threshold was $31,740,538 in trading profit. If Signature made a penny less than this amount, Ferguson did not

owe Butler a 2018 CPP payment. But if that marginal penny was added, Butler was entitled to $3.3 million. Thus, that one cent of profit would actually cost Ferguson $3.3 million, reducing Ferguson's profit to $28,407,205. And because Butler was entitled to 83.3% of "the amount by which the 2018 Trading Profit is greater than the 2018 Threshold" until his CPP payment equaled $6.7 million, Ferguson actually ended up with less than the 2018 threshold if Signature's trading profit ended anywhere between $31,740,538 and $38,407,204. In other words, the CPP provision gave Ferguson two ways to maximize the money it made from Signature: end the year between $28,407,205 and $31,740,538 or above $38,407,204.

With this understanding, it would be perfectly logical for Ferguson to attempt to come in just below the 2018 CPP threshold. And although an economic incentive to perform acts forbidden by contract is not necessarily indicative of a breach-of-contract claim, Butler describes specific actions taken by Ferguson that align with this incentive and raise reasonable inferences of Ferguson's intent.

Take the 12-Month Rule. According to Butler, the 12-Month Rule required Signature to expense a significant portion of its inventory but did not affect the actual financial health of the company. The Rule appears to have merely shuffled numbers from one side of Signature's ledger to the other, bringing down its trading profit in the process. And not only did implementation of the 12-Month Rule directly affect Signature's bottom line, it hindered Signature's most profitable business strategy: buying new and unique products in bulk from overseas manufacturers. Further, Ferguson did not apply the 12-Month Rule to its own products and ignored requests to exempt Signature from the Rule even though IFRS did not require it and Ferguson's accounting rules permitted an exemption. In all, Butler's allegations show that Signature was singled out for a seemingly arbitrary accounting rule that targeted its main business strategy and artificially deflated

its trading profit. Based on these allegations, it is plausible to conclude that at least one of the motivations for this rule was to avoid or reduce Butler's CPP payment, a liability that was directly tied to Signature's trading profit.

The district court viewed the plausibility of these allegations differently. First, the court noted that the 12-Month Rule "was in place for the majority of the time period during which the 2017 Trading Profit was calculated," and because Butler received the maximum CPP payment in 2017, the court doubted that the Rule "was developed to avoid having to make the 2018 payment." This results-oriented reasoning contradicts the MIPA's language. To breach the MIPA, Ferguson need not *actually* reduce or avoid a CPP payment; the mere intent to do so is sufficient. That the 12-Month Rule might not have had its intended effect in 2017 does not exonerate Ferguson. Second, the district court stated that Butler "allege[d] that Signature missed the Trading Profit Threshold . . . by $1,106,341, but also admits that the 12-Month Rule only reduced Signature's Trading profit by $1,015,524." But Butler never admitted anything of the sort. Instead, he alleged that Ferguson had promised him that it would credit Signature in that amount to try to offset the 12-Month Rule's negative impact. The district court then compounded its results-oriented misstep, concluding that even if Ferguson had intended the 12-Month Rule to reduce or avoid a CPP Payment, it made no difference because the 12-Month Rule alone did not cause Signature to miss the 2018 threshold. Although the question of whether Ferguson's ill-intended actions—either singly or cumulatively—caused Signature to miss the threshold might go to the issue of damages, it has nothing to do with whether Ferguson breached the contract, which is the only issue currently before the court.

Consider too Butler's new-bonus-policy allegations. Butler argues that the move to fixed-employee bonuses "directly increase[ed] [Signature's] expenses in the form of unearned bonus

payments," a theory of breach that the district court did not address below. This change also aligned with Ferguson's economic incentive to stay under the CPP threshold. By paying bonuses to other Signature employees, Ferguson could avoid paying an even larger bonus to Butler. For example, if additional bonuses paid under the new policy equaled $1.1 million, and Signature missed its 2018 CPP threshold by less than that amount, that $1.1 million extra expenditure would foreclose a 2018 CPP payment and Ferguson would realize a net savings of $2.2 million. In doing so, Ferguson would maximize its profits by directing money to this new expense. Thus, it is plausible to conclude that at least one of the motivations for the new policy was to avoid or reduce Butler's CPP payment.

Of course, Ferguson could have acted with an innocent intent and discovery may show that all of its changes have perfectly legitimate business purposes. But at the pleading stage, "[f]erreting out the most likely reason for [Ferguson's] actions is not appropriate," *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011), and "the availability of other explanations—even more likely explanations—does not bar the door to discovery," *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013). Moreover, Butler may allege intent "generally." Fed. R. Civ. P. 9(b). Because Butler has alleged facts that raise a reasonable inference of Ferguson's wrongful intent, the district court erred in dismissing his breach-of-contract claim as implausible.

IV.

Butler also argues that, under the MIPA, Ferguson must indemnify him for his loss of a 2018 CPP payment because it received his objection to its trading profit calculation and did not respond within 15 days. Ferguson argued below that Butler did not provide reasonable notice that he was invoking the indemnification process. The district court did not address this argument,

holding instead that "if [Ferguson] did not breach . . . the MIPA, then Butler would have no claim for indemnity."

The district court erred in its treatment of the indemnification claim. Butler is seeking indemnification based on Ferguson's failure to comply with the MIPA's indemnification procedure, not Ferguson's alleged breach of any other provision. Under Butler's theory, Ferguson's failure to respond to his objection—regardless of the objection's merit—entitles him to relief under the MIPA. And Ferguson does not argue that it complied with the 15-day deadline; it only contends that Butler did not provide sufficient notice. Thus, the notice issue is dispositive of Ferguson's arguments for dismissal of the indemnification claim. Because "we are a court of review, not first view," *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015), we remand to the district court for it to decide this claim in the first instance. *See also Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist.*, 600 F. App'x 448, 453 (6th Cir. 2015) ("We generally do not consider issues left unaddressed by the district court.").

V.

For these reasons, we reverse and remand to the district court for proceedings consistent with this opinion.